823 F.2d 945
 47 Fair Empl.Prac.Cas. 544,
43 Empl. Prac. Dec. P 37,221,
45 Empl. Prac. Dec. P 37,656
Stanley M. JANIKOWSKI, Plaintiff-Appellant,
v.
BENDIX CORPORATION, a Delaware corporation, Defendant-Appellee.
 No. 85-1643.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 16, 1986.
Decided July 9, 1987.
Order on Rehearing Sept. 28, 1987.
 
 George B. Washington (argued) Greenspon, Scheff & Washington, P.C., Detroit, Mich., for plaintiff-appellant.
 Michael A. Alaimo (argued), Detroit, Mich., for defendant-appellee.
 Before NELSON and RYAN, Circuit Judges and ENSLEN, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Stanley Janikowski, plaintiff, appeals the district court's order granting defendants summary judgment on his age discrimination (Age Discrimination in Employment Act, 29 U.S.C. Secs. 621-634 (1985)) (ADEA), and Elliot-Larsen Civil Rights Act, Mich.Comp.L.Ann. Secs. 37.2101-37.2804 (1985) claims and the court's order denying him leave to amend his complaint to include a breach of contract action.
 
 
 2
 We affirm the district court's order granting summary judgment to defendants on the ADEA claim, and reverse the grant of summary judgment on the Elliot-Larsen claim and the order denying leave to amend the complaint.
 
 
 3
 Bendix Corporation employed Janikowski in its Tax Department from September 1, 1971 through November 30, 1981. In 1979 and 1980, he received low grades on his performance review. Thereafter, he requested a transfer because of difficulties with his supervisor. Although he remained in the Tax Department, plaintiff's position changed to that of Corporate Tax Executive--Special Projects.
 
 
 4
 When Bendix encountered a business decline in 1980, it implemented a reduction in work force. On September 4, 1980, Janikowski's supervisor, Ron Weinel, informed him his employment would terminate September 30, 1981. Subsequently, Weinel sent Janikowski a memo, dated November 18, 1980, stating that his position would terminate September 30, 1981, and that, "if on the date of your termination from the Tax Department, you have not secured a position elsewhere within Bendix, you will be terminated from employment." Weinel urged plaintiff to seek employment both within and without Bendix.
 
 
 5
 Bendix offered Janikowski time off for interviews, plus assistance in the preparation of resumes. In December 1980, Janikowski met with a member of Bendix's Human Resources Department and an individual from Bendix's recruiting firm to begin his search for employment outside the company. He also contacted professional recruiters and business associates while looking for work. Although he also applied for several jobs within Bendix, he received no offers.
 
 
 6
 Unable to obtain a new position, Janikowski requested that Bendix postpone the termination of his employment. He was granted an extension on a month-to-month basis. In mid-November 1981, Bendix advised Janikowski his employment would come to an end November 30, 1981. He departed Bendix on November 30, 1981.
 
 
 7
 On May 14, 1982, Janikowski filed age discrimination charges against Bendix with the EEOC and the Michigan Civil Rights Commission. The EEOC dismissed the complaint on March 28, 1983, and Janikowski filed the present action on November 28, 1983. Alleging federal jurisdiction based on both diversity of citizenship, 28 U.S.C. Sec. 1332, and the Age Discrimination in Employment Act, 29 U.S.C. Secs. 621-634, the complaint charged Bendix with having violated Sec. 4 of the ADEA, 29 U.S.C. Sec. 623, and Sec. 202 of Michigan's Elliot-Larsen Civil Rights Act, Mich.Comp.L.Ann. Sec. 37.2202.
 
 I.
 
 8
 The district court dismissed the federal ADEA claim as having been untimely filed. In states such as Michigan, which have their own laws forbidding age discrimination, a plaintiff must file a claim of ADEA violation with the EEOC "within 300 days after the alleged unlawful practice occurred," 29 U.S.C. Sec. 626(d)(2), failing which, any suit under the ADEA filed in the federal district court will be dismissed as untimely. Janikowski argues that the alleged act of discrimination occurred the day he was actually discharged, November 30, 1981. The district court held the alleged unlawful practice occurred on September 4, 1980, the day Janikowski received notification of his eventual termination. If plaintiff's cause of action accrued when Bendix notified him they were terminating him, his ADEA claim was untimely, and summary judgment was properly granted. If his cause of action accrued on his last day of work, then his ADEA claim was timely, and the district court erred.
 
 
 9
 A long line of cases, including two Supreme Court cases, Chardon v. Fernandez, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981); Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), hold that a plaintiff's cause of action under the ADEA accrues when he receives a notice of termination, not when his employment actually ceases. See also Baer v. R & F Coal Co., 782 F.2d 600, 602 (6th Cir.1986). In Chardon, the Supreme Court reiterated that "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." 454 U.S. at 8, 102 S.Ct. at 29. Further, " '[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.' " Id. (quoting Ricks, 449 U.S. at 257, 101 S.Ct. at 504). To avoid the preclusive effect of Ricks and Chardon, Janikowski argues that the notification he received was not definite and final. He points out that while there was no doubt he would leave the Tax Department, Bendix left open the possibility that he could continue working elsewhere in the company.
 
 
 10
 Ricks has determined this issue in Bendix's favor. In Ricks, the plaintiff professor claimed the defendant college denied him academic tenure because of his national origin. The Supreme Court rejected Ricks' argument that the limitations' period did not begin to run upon notification of the adverse tenure decision because the "letter explicitly held out to Ricks the possibility that he would receive tenure if the Board sustained his grievance." 449 U.S. at 260, 101 S.Ct. at 505. Ricks held that the cause of action accrued when Ricks received notice he would be terminated, regardless of whether the letter was equivocal in holding out the possibility that he might receive tenure and thereby avoid termination. In Kessler v. Board of Regents, 738 F.2d 751, 755 (6th Cir.1984), this court recognized that employment decisions which are "somewhat ambiguous with respect to ... finality" still trigger the statute of limitations. Kessler suggested that a notice of termination which expressly stated it was not final could still suffice to start the running of the statute of limitations. Id. at 755-56. See also Miller v. IT & T Corp., 755 F.2d 20 (2d Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985), which held that a notice of termination starts the statute of limitations. Plaintiff's seeking a new position within the company before his last day of work ended did not toll the period of limitations.
 
 
 11
 Janikowski next asserts that the "continuing violation" doctrine saves his suit because the notice of termination given in the fall of 1980 was but one manifestation of a pattern of discrimination that continued up to his eventual termination. Bendix's refusals to place Janikowski in other departments were allegedly other manifestations of Bendix's continuing pattern of discrimination. Thus, according to Janikowski, the statute of limitations did not begin to run until the last discriminatory act in Bendix's continuing violation of the ADEA occurred. This last act, according to Janikowski, was his actual discharge.
 
 
 12
 But plaintiff's search for other employment with Bendix was an attempt to avoid the consequences of the termination. "Repeated requests for further relief from a prior act of discrimination will not set the time limitations running anew." EEOC v. McCall Printing Corp., 633 F.2d 1232, 1237 (6th Cir.1980) (citing Goldman v. Sears, Roebuck & Co., 607 F.2d 1014 (1st Cir.1979), cert. denied, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980)).
 
 
 13
 In Held v. Gulf Oil Co., 684 F.2d 427 (6th Cir.1982), we applied the "continuing violation" doctrine where defendant had subjected plaintiff to discriminatory working conditions throughout the term of her employment; but Bendix's discrete decisions not to employ Janikowski in other positions bear no resemblance to the daily discrimination suffered by the plaintiff in Held. In Roberts v. North American Rockwell Corp., 650 F.2d 823 (6th Cir.1981), the plaintiff established a continuing violation on the basis of the defendant corporation's repeated refusals to hire her; but there the defendant company had a policy of discriminating against women. We said:
 
 
 14
 "In many such situations, the refusal to hire or promote results from an ongoing discriminatory policy which seeks to keep blacks or women in low-level positions or out of the company altogether. In such cases, courts do not hesitate to apply what has been termed the continuing violation doctrine.
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 "If an ongoing discriminatory policy is in effect, the violation of Title VII is ongoing as well."
 
 
 18
 Id. at 826-27. In the case at bar, Janikowski has alleged no over-arching policy of discrimination against fifty year olds. In the absence of such a policy, there is no continuing violation. We are satisfied the district court properly dismissed plaintiff's ADEA claim as having been untimely filed.
 
 II.
 
 19
 Janikowski next challenges the district court's grant of summary judgment on the Michigan Elliot-Larsen Civil Rights Act, Mich.Comp.L.Ann. Secs. 37.2101-37.2804, claims on statute of limitations grounds. The applicable Michigan statute of limitations is three years. Janikowski contends that Michigan law, unlike Ricks and Chardon, starts the statute of limitations from the date of actual discharge rather than the date of notification of discharge. Again, Janikowski's suit is timely if the period of limitations accrues from the date of discharge, but is untimely if that period accrues from the day Bendix notified him they were terminating him.
 
 
 20
 Unfortunately, the Michigan Supreme Court has never addressed this question. Pursuant to the Erie doctrine, our task is to divine what the Michigan high court would say if faced with the issue. To paraphrase the late Chief Justice Vanderbilt of New Jersey: Guessing what the Michigan Supreme Court will hold in a case not yet before it, upon an issue it has never addressed, is no sport for the short-winded.[1] But guess we must, in the proper exercise of our diversity jurisdiction over plaintiff's Michigan Elliot-Larsen claim of discriminatory discharge.
 
 
 21
 Our guess is that if it were confronted with the issue before us, the Michigan Supreme Court would veer away from the current federal precedent and declare that the period of limitations for the plaintiff's Elliot-Larsen claim began to run the date plaintiff actually stopped working, November 30, 1981.
 
 
 22
 In two analogous but concededly not dispositive employment discrimination cases, one a wrongful refusal to provide sick leave pay and the other a wrongful nonhiring case, both brought under the Michigan predecessor to the Elliott-Larsen Act, but not distinguishable therefrom with respect to the point at issue, the Michigan Court of Appeals held that the period of limitations for filing suit began to run from the date plaintiff received no sick pay rather than the date of notice sick leave pay was unavailable for maternity purposes, Northville Public Schools v. Civil Rights Commission, 118 Mich.App. 573, 325 N.W.2d 497 (1982), and, in the discriminatory nonhiring case, from the date the successful candidate started work, not the date the discriminatee was notified she was discriminatorily rejected, Department of Civil Rights ex rel Zlotogura v. City of Muskegon, 100 Mich.App. 557, 298 N.W.2d 760 (1980).
 
 
 23
 To be sure, the Zlotogura Court, in opting for the date the successful hiree actually started working and not the date the plaintiff was notified of her discriminatory rejection, cited the Third Circuit decision in Ricks v. Delaware State College, which was later reversed by the United States Supreme Court, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). But the Zlotogura Court also cited to other federal court of appeals cases, Egelston v. State University College, 535 F.2d 752 (2d Cir.1976), and Noble v. University of Rochester, 535 F.2d 756, 758 (2d Cir.1976), and stated the following:
 
 
 24
 "The rationale underlying these decisions is that a seemingly final decision may be reconsidered and sometimes reversed and it is not desirable to encourage the initiation of litigation which could preclude the possibility of reconsideration; and, more importantly from a practical point of view, a rule which requires an employee actually to cease or begin employment in order to trigger the running of the statutory limitation period serves as a bright guideline for both the courts and the victims of discrimination.... Such a rule makes unnecessary a 'date of discovery' rule, with all of its attendant uncertainties, since the date on which an employee begins working or discontinues working or assumes the responsibilities of a new position following promotion is readily apparent to all concerned."
 
 
 25
 Zlotogura, 100 Mich.App. at 560, 298 N.W.2d 760.
 
 
 26
 The rationale of the lower court's decision in Ricks was persuasive to the Michigan court, and there is no reason to assume it is no longer persuasive in Michigan.
 
 
 27
 Two years later, in Northville Public Schools v. Civil Rights Commission, 118 Mich.App. 573, 325 N.W.2d 497, another panel of the Michigan intermediate court held that the period of limitations in the same statute ran not from the date the employee in that case was notified of the school district's discriminatory sick leave policy, but the date she would have been, but was not, paid for the days she was denied compensation because of the discriminatory policy. Id. at 579, 325 N.W.2d 497.
 
 
 28
 The Northville Court adopted the rationale employed by the Zlotogura Court, and indeed quoted that same portion in its opinion. Id. at 578, 325 N.W.2d 497. The Northville Court acknowledged that Ricks had, in the meantime, been reversed by the United States Supreme Court but distinguished Ricks on its facts; implying that its rationale, if not appealing to the United States Supreme Court, continued to appeal to the Michigan intermediate court.
 
 
 29
 Now that the Michigan Supreme Court has overruled Robson v. General Motors Corp., 137 Mich.App. 650, 357 N.W.2d 919 (1984), overruled sub nom, Sumner v. Goodyear Tire & Rubber Co., 427 Mich. 505, 398 N.W.2d 368 (1986), the only two analogous cases from the Michigan intermediate appellate courts suggest the Elliot-Larsen period of limitations began to run the date plaintiff became jobless, rather than the day he found out he would become jobless. Where no state supreme court precedent is applicable, "[i]n predicting how a state's highest court would rule, federal courts must follow intermediate state court decisions, policies underlying the applicable legal principles, and the doctrinal trends indicated by these policies." Weiss v. United States, 787 F.2d 518, 525 (10th Cir.1986); see also Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir.1984); Erie Castings Co. v. Grinding Supply, Inc., 736 F.2d 99, 100 (3d Cir.1984).
 
 
 30
 Furthermore, the Michigan Supreme Court, in its very recent decision in Sumner v. Goodyear Tire & Rubber Co., 427 Mich. 505, 398 N.W.2d 368 (1986), declared in dicta that "Ricks [had] created a great deal of confusion because the Court did not define exactly how it construed the denial of tenure" in that case, id. at 531, 398 N.W.2d 368, and then stated:
 
 
 31
 "The dissent in Ricks addressed the problems created by this early accrual date. First, it creates a difficult line-drawing problem for the courts, as they must determine when notice has been given. Second, it encourages litigation, rather than internal resolution. Third, the lack of a bright line will confuse wronged individuals and limit the remedial value of Title VII. 449 U.S. [at] 266, [101 S.Ct. at 508].
 
 
 32
 "Justice Stevens' dissent pointed out:
 
 
 33
 " 'The most sensible rule would provide that the date of discharge establishes the time when a cause of action accrues and the statute of limitations begins to run. Prior to that date, the allegedly wrongful act is subject to change; more importantly, the effective discharge date is the date which can normally be identified with the least difficulty or dispute.
 
 
 34
 " '... Both the interest in harmonious working relations during the terminal period of the employment relationship, and the interest in certainty ... support this result.' "
 
 
 35
 Id. at 532, 398 N.W.2d 368. Dicta, while not controlling, is relevant to our inquiry into what the state supreme court would hold if faced with this case. Nicolson v. Life Insurance Co., 783 F.2d 1316, 1319 (5th Cir.1986).
 
 
 36
 Concededly, the foregoing statement by the Michigan Supreme Court in Sumner was in the context of the court's concern that the Ricks decision had created confusion in an employment discrimination case which related to the discharge of a tenured teacher, and those are not the facts of our case. Nevertheless, the court's concern about the rationale of the "line-drawing problem for the courts," which it perceived was created by Ricks, and its apparently approving citation of Justice Stevens' language in dissent in Ricks, suggests rather strongly a sympathy with that dissenting view--at least as respects fixing the date for the running of the period of limitations in Michigan employment discrimination cases.
 
 
 37
 Finally, in Sumner, the Michigan Supreme Court declared:
 
 
 38
 "We note nevertheless that the early accrual date mandated by Ricks and Chardon may conflict with the principle, well-established in Michigan law, that a cause of action does not accrue until an injury has occurred. We leave further exploration of this possible conflict to another date as it is Evans, rather than Ricks or Chardon, which defines the analysis relevant to the instant cases."
 
 
 39
 Id. at 533, 398 N.W.2d 368.
 
 
 40
 The opinion by Justice Brickley, in Sumner, from which the foregoing is quoted, was signed by four of the presently seated justices of the Michigan court, and the dissenting opinion, signed by the two other justices who remain members of the court, expressed disagreement with the majority opinion only in particulars unrelated to the foregoing issue.
 
 
 41
 For all of these reasons, our diversity jurisdiction "crystal ball" suggests the Michigan Supreme Court would conclude, on the facts before us, that the period of limitations for Janikowski's Elliot-Larsen claim began to run from the date his employment was terminated, November 30, 1981, and not September 4, 1980, the date he was notified "that his employment would be terminated by September 30, 1981." Therefore his suit was timely, and the district court erred in dismissing it.
 
 III.
 
 42
 We are in accord with Mr. Janikowski's contention on appeal that he ought to have been allowed to amend his complaint to include a cause of action for breach of contract.
 
 
 43
 The complaint was filed on November 28, 1983, less than a year before leave was sought to amend it. On March 20, 1984, the District Court issued a preliminary pretrial order setting a discovery cut-off date of October 1, 1984, a motion cut-off date of November 1, 1984, and a final pretrial conference date of December 4, 1984. Bendix moved for summary judgment on August 14, 1984. On October 3, 1984, the parties agreed that there would be no further discovery pending disposition of the motion for summary judgment. It was also understood that a request by plaintiff for an extension of the discovery cut-off date would be postponed until October 29, 1984, the date set for oral argument on defendant's summary judgment motion.
 
 
 44
 Plaintiff first advanced his contractual violation theory at the argument on October 29. The introduction of the new theory prompted the court to schedule additional briefing, effectively nullifying the date previously set for the final pretrial conference. On November 1, 1984--within the original deadline for the filing of motions--plaintiff moved to extend discovery and moved for leave to amend the complaint to include the claim for breach of contract. Additional oral argument on the summary motion judgment was held on January 25, 1985--at which time plaintiff's attorney reminded the district court of the pending motion to amend--and summary judgment was granted on March 12, 1985. 603 F.Supp. 1284. The court's ruling made no mention of the motion for leave to amend. On April 10, 1985, Mr. Janikowski moved for relief from judgment to permit amendment of the complaint. On July 10, 1985, the court declined to grant leave to amend, indicating that the defendant would be prejudiced by the additional and duplicative discovery the amendment would have required, and stressing that the plaintiff had not furnished any reason for the delay in proffering the new theory.
 
 
 45
 Rule 15(a), Fed.R.Civ.P., provides that leave to amend shall be "freely given" when justice so requires. The thrust of the provision "is to reinforce the principle that cases should be tried on their merits rather than on the technicalities of pleadings." Tefft v. Seward, 689 F.2d 637, 639 (6th Cir.1982). Delay that is not intended to harass the defendant is not in itself a permissible reason to refuse leave to amend. Id., at 639, n. 2. Furthermore, there must be "at least some significant showing of prejudice to the opponent" if the motion is to be denied. Moore v. City of Paducah, 790 F.2d 557, 562 (6th Cir.1986). Although this court reviews denials of leave to amend only for abuse of discretion, it should be emphasized that the case law in this Circuit manifests "liberality in allowing amendments to a complaint." Id.
 
 
 46
 In this instance there is simply no showing of prejudice to Bendix sufficient to preclude plaintiff from introducing his contract claim. In the brief Bendix filed with the district court opposing the motion for leave to amend, the only claim of prejudice was that "Bendix would ... be put to the expense of conducting a second round of discovery including re-deposing Plaintiff." At the hearing on the motion Bendix added nothing to what it had said in its brief.
 
 
 47
 On appeal Bendix asserts that because the former corporate offices have been disbanded as a result of a merger that occurred on April 1, 1985, it may be impossible to reconstruct personnel policies relevant to the new cause of action. This claim of prejudice was not asserted before the district court. The only reference to any difficulty in obtaining the information necessary to defend the contract claim was one oblique suggestion that "defendant is not in a position to know whether any of that information is currently available." More important, plaintiff filed his motion to amend on November 1, 1984, and reminded the district court of the motion on January 25, 1985. The relevant date for the determination of prejudice is therefore prior to the merger.
 
 
 48
 Although prejudice has been found in cases where the motion for leave to amend was filed after completion of discovery, Roberts v. Arizona Board of Regents, 661 F.2d 796, 798 (9th Cir.1981); Addington v. Farmer's Elevator Mutual Insurance Co., 650 F.2d 663, 667 (5th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981), no such fact pattern is present here. The proper remedy for subjecting Bendix to duplicative discovery would be to require the amending party to bear a portion of the additional expense. Local 783, Allied Industrial Workers of America, AFL-CIO v. General Electric Co., 471 F.2d 751, 756 (6th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973). Mr. Janikowski's counsel acknowledged at oral argument that it would be within the district court's power to require payment for the cost of duplicative discovery.
 
 
 49
 The order denying leave to amend the complaint is REVERSED. The summary judgment entered in defendant's favor on the federal Age Discrimination in Employment Act claim is AFFIRMED, that on the Michigan Elliot-Larsen claim is REVERSED, and the case is REMANDED for further proceedings in conformity with the opinion of this court.
 
 
 50
 DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part. I concur in Parts I and III of the court's opinion, but respectfully dissent from Part II.
 
 
 51
 Under federal law, the statute of limitations on a claim for discriminatory discharge begins to run on the date the employee receives his pink slip, and not the date on which he receives his last pay check or puts in his last day at work. Thus if an employee is given 30 days notice on September 1, any federal claim for discriminatory discharge accrues on September 1, the date of the firing, and not September 30.
 
 
 52
 It is an open question whether Michigan would follow the lead of the federal courts in deciding the cognate question of when a cause of action accrues for violation of Michigan's Elliott-Larsen Civil Rights Act. I agree with the district court, however, that Michigan would probably find the federal precedents persuasive. See Langlois v. McDonald's Restaurants of Michigan, 149 Mich.App. 309, 385 N.W.2d 778, 780 (1986) and Michigan Civil Rights Commission ex rel. Boyd v. Chrysler Corp., 80 Mich.App. 368, 263 N.W.2d 376 (1977), treating federal precedent on questions arising under the civil rights laws as "highly persuasive."
 
 
 53
 Sumner v. Goodyear Tire & Rubber Co., 427 Mich. 505, 398 N.W.2d 368 (1986), dealt with the same sort of "continuing violation" theory that plaintiff Janikowski advanced unsuccessfully in the case at bar. In Sumner the Michigan Supreme Court declared that it was "appropriate" to turn to federal precedent for guidance in formulating the law of Michigan. The Michigan court gave careful consideration to the decisions of the United States Supreme Court in Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and Chardon v. Fernandez, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), and declared--with evident approval--that "Ricks and Chardon bar the transforming of a single discriminatory act into a continuing one." 398 N.W.2d at 368. The sort of "single discriminatory act" considered in Ricks and Chardon is functionally indistinguishable, I think, from the discharge of Plaintiff Janikowski on September 4, 1980.
 
 
 54
 It is true that Sumner contains dicta evincing some sympathy with the contentions, advanced by Justice Stevens in his dissenting opinion in Ricks, that denial of tenure to a college teacher ought not to start the limitations period running on a federal civil rights claim because (1) it is difficult to determine when notice of the denial of tenure has been given, (2) an early accrual date "encourages litigation," and (3) "the lack of a bright line will confuse wronged individuals and limit the remedial value of Title VII." 398 N.W.2d at 379, citing 449 U.S. at 266, 101 S.Ct. at 508. The Court's sympathy toward Justice Stevens' views may suggest that the Michigan Supreme Court will ultimately conclude, as a Michigan Appellate Court did conclude in Department of Civil Rights ex rel. Zlotogura v. Muskegon, 100 Mich.App. 557, 298 N.W.2d 760 (1980); that a cause of action for a discriminatory hiring decision only accrues when the successful applicant actually starts work. It is far less likely that an unsuccessful applicant for employment will know when a competing applicant has been hired, however, than it is that a person already on the payroll will be told he is being fired without realizing what is happening to him. It is not normally difficult to determine when an employee has been told he is being discharged, and there was certainly no difficulty in making that determination in the case at bar. I fail to see why it "encourages litigation" to hold that a cause of action for wrongful discharge accrues on the date when the fact of the discharge is communicated to the employee, any more than it encourages litigation to hold that a cause of action for any anticipatory breach of contract accrues on the date of the anticipatory breach. Carpenter v. Smith, 147 Mich.App. 560, 383 N.W.2d 248, 250 (1985). The date when an employee is notified of his discharge does constitute a "bright line," in my view, and I do not understand why the Michigan Supreme Court should suppose that it would confuse wronged individuals or limit the remedial value of the Elliott-Larsen Act to hold that the time within which suit must be filed starts to run on that particular "bright line" date.
 
 
 55
 It is also true that the Michigan Supreme Court suggested in Sumner that the accrual date mandated by Ricks and Chardon "may conflict" with the well established principle of Michigan law that "a cause of action does not accrue until an injury has occurred." It was not necessary to explore this question in Sumner, but it is my guess that the conflict would be found more apparent than real upon analysis.
 
 
 56
 Michigan law is far from unique insofar as it contemplates that a limitations period will not begin to run until an injury has occurred. For example, the long-standing rule for 42 U.S.C. Sec. 1983 suits has been that the plaintiff's cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." Bireline v. Seagondollar, 567 F.2d 260, 263 (4th Cir.1977), cert. denied, 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979); Sevier v. Turner, 742 F.2d 262, 273 (6th Cir.1984). In Bireline, with clear recognition of this federal requirement for accrual, the Fourth Circuit held that a university instructor's sex discrimination claim accrued upon notification of termination. Federal courts have seen no conflict between Ricks and the principle of federal law that statutes of limitation begin to run only when there has been an injury, Pauk v. Board of Trustees of the City University of New York, 654 F.2d 856, 859-61 (2d Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982), and I see no reason why Michigan should find a conflict between the corresponding state principle and a state limitations rule patterned on Ricks.
 
 
 57
 Under Michigan law, as far as I am aware, a claim for compensation in respect of intangible injury--such as emotional distress or harm to reputation--is held to accrue at the earliest date the injury might have been sustained. Stringer v. Board of Trustees, 62 Mich.App. 696, 233 N.W.2d 698 (1975); MacDonald v. Ford Motor Co., 117 Mich.App. 538, 324 N.W.2d 489 (1982). "It is ... the fact of identifiable and appreciable loss, and not the finality of monetary damages, that gives birth to the cause of action." Luick v. Rademacher, 129 Mich.App. 803, 342 N.W.2d 617, 618 (1983). Plaintiff Janikowski sought damages for his "[m]ental and emotional pain and anguish," and a jury would surely have been entitled to award damages for the distress he suffered after being notified of the decision to terminate his employment but before his pay was actually stopped. "Later damages may result, but they give rise to no new cause of action, nor does the statute of limitations begin to run anew as each item of damage is incurred." Connelly v. Paul Ruddy's Equipment Repair, 388 Mich. 146, 200 N.W.2d 70, 73 (1972).
 
 
 58
 My distinguished colleagues from Michigan have backgrounds that probably make them more reliable soothsayers than I when it comes to predicting the future actions of the Supreme Court of Michigan, but, for the reasons indicated, my own guess is that the Michigan Supreme Court would ultimately decide the state statute of limitations question the way Judge Phillip Pratt decided it in the district court. See 603 F.Supp. at 1292, et seq. Accordingly, I would affirm Judge Pratt's decision on this issue.
 
 
 59
 RYAN, Circuit Judge, dissenting in part from Part III.
 
 
 60
 I must respectfully dissent from the court's conclusion that the trial judge abused his discretion in denying the plaintiff's motion to amend the complaint to plead a wholly new cause of action in breach of contract.
 
 
 61
 Undoubtedly there are a number of reasons why the trial court, in its discretion, might have allowed the requested amendment. The plaintiff has articulated some of them. However, this court, in reversing the decision below, seems to rely entirely upon the provision of Fed.R.Civ.P. 15(a) which provides that leave to amend shall be "freely given" when justice so requires.
 
 
 62
 The defendant has articulated a number of reasons why the trial court was correct in denying the amendment. The majority's opinion restates some of those reasons and finds them unpersuasive--just as the trial court apparently found them to be persuasive.
 
 
 63
 But the rules vest the trial court, not this court, with the discretionary authority to pass upon latecoming motions to amend the pleadings. Fed.R.Civ.P. 15(a); Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519, 1526 (11th Cir.1985); Estes v. Kentucky Utilities Co., 636 F.2d 1131, 1133 (6th Cir.1980). See also Acri v. International Association of Machinists & Aerospace Workers, 781 F.2d 1393 (9th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986); Ansam Associates v. Cola Petroleum, Ltd., 760 F.2d 442 (2d Cir.1985); Stepanischen v. Merchants Despatch Transportation Corp., 722 F.2d 922 (1st Cir.1983); Roberts v. Arizona Board of Regents, 661 F.2d 796 (9th Cir.1981). Simply because this court might think the requested amendment would not interfere with the efficient administration of justice or unfairly prejudice the defendant is no basis whatever to reverse the trial court's decision to the contrary. We have no authority to make a decision whether justice does or does not require that leave be granted to amend the pleadings. That power is given to the trial court alone. Our authority is limited to deciding whether the trial court, having made a decision in the matter, acted so arbitrarily, capriciously, and utterly without reason or logic as to have abused its discretion in deciding the matter. Plainly, the trial court's decision to deny the motion to amend was not that.
 
 
 64
 The court gave the following reasons for refusing the requested amendment:
 
 
 65
 --That the request came nearly eight months after the original lawsuit was filed, and after a considerable amount of discovery in the case was completed;
 
 
 66
 --That it was filed only after oral argument on the defendant's motion for summary judgment illuminated the fatal deficiencies in the plaintiff's age discrimination and Elliot-Larsen civil rights claims;
 
 
 67
 --That the amended complaint pleads a wholly new cause of action and not merely a refinement or clarification of the earlier pleaded claims;
 
 
 68
 --That amendments are not normally allowed after judgment has entered upon the case originally pleaded;
 
 
 69
 --That the latecoming amendment would undoubtedly necessitate an entirely new round of very expensive discovery, largely duplicative and entirely avoidable had the Toussaint claim been pleaded earlier;
 
 
 70
 --That no showing whatever was made by plaintiff explaining why the Toussaint claim was not pleaded at the outset of the lawsuit;
 
 
 71
 --That nothing in the substantial pretrial discovery disclosed for the first time the availability of the Toussaint claim and that the availability of that cause of action was equally apparent at the time the case was originally filed as it was at the time the motion for amendment was filed; and
 
 
 72
 --That the defendant would be unfairly prejudiced by being required to sustain the expense and related inconvenience of a repeat round of responsive pleading, discovery and motion practice, all of which might have been undertaken as an aspect of the first round of pretrial litigation in the case.
 
 
 73
 Those are reasons. They are the evaluations which comprise the informed and considered judgment of a wise and experienced trial judge. There is nothing arbitrary, capricious, irrational, or illogical about them. The court's ruling was a thoughtful and reflective exercise of discretion; not an absence of it or an abuse of it.
 
 
 74
 My brother's persuasive statement why the amendment should have been granted explains why the majority would have decided the motion to amend differently, had it been empowered to do so; it is not a persuasive argument that the trial court's decision to the contrary was an abuse of discretion.
 
 
 75
 I would affirm the decisions of the lower court to dismiss plaintiff's ADEA claim and to deny plaintiff leave to amend his complaint. I would reverse the district court's dismissal of plaintiff's Elliot-Larsen Act claim on statute of limitations grounds.
 
 ORDER
 
 76
 Upon receipt of petition for rehearing, with a suggestion for rehearing en banc, tendered by the appellee, and a motion offered by the same party seeking certification to the Michigan Supreme Court of a question of law; it is
 
 
 77
 ORDERED that the petition for rehearing en banc be rejected as untimely; it is further ORDERED that the motion to certify be filed and forwarded to the court, along with the opposition of the appellant, for resolution.
 
 
 
 *
 The Honorable Richard A. Enslen, United States District Court for the Western District of Michigan, sitting by designation
 
 
 [1]
 What Chief Justice Vanderbilt actually said was: "Manifestly judicial reform is no sport for the short-winded...." A. Vanderbilt, Minimum Standards of Judicial Administration, p. xix (The Law Center of New York University 1949), as quoted in Memorable Legal Quotations 544 (E. Gerhart, ed. 1969)