Vera M. ENGLISH, Petitioner,

v.

Dennis E. WHITFIELD, Deputy Secretary of Labor;  United States Department of Labor, Respondents,

General Electric Company, Intervenor.

No. 87–3520.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1988.

Decided Oct. 6, 1988.

Arthur Michael Schiller (Mark A. Venuti, Washington, D.C., on brief), for petitioner.

Ford Friel Newman (George R. Salem, Solicitor of Labor, Monica Gallagher, Associate Solicitor, Linda Jan S. Pack, for Appellate Litigation, Office of the Solicitor, U.S. Dept. of Labor, Washington, D.C., on brief), for respondents.

Peter G. Nash (Dixie L. Atwater, Ogletree, Deakins, Nash, Smoak and Stewart, Washington, D.C., William W. Sturges, Weinstein and Sturges, Charlotte, N.C., for intervenor.

Before RUSSELL, PHILLIPS and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Vera M. English instituted this suit under the Employee Protection Section of the Energy Reorganization Act of 1974, as amended, 42 U.S.C. § 5851 (EPS), and its implementing regulations, 29 C.F.R. § 24, alleging that she was unlawfully subjected to employment related discrimination because she registered and pursued safety complaints against her employer, General Electric (GE), with the Nuclear Regulatory Commission (NRC). After an administrative law judge (ALJ) recommended that the Secretary of Labor find that English had been discharged in violation of the EPS's anti-retaliation provisions, the Secretary (by a Deputy) dismissed English's claim, ruling that she had failed to meet the 30–day filing deadline imposed by § 5851(b)(1). Before us English raises two primary issues for review: whether (1) the Secretary erred in finding her complaint for discriminatory discharge barred as untimely, and whether (2) English has established a "continuing violation" of the EPS in the form of retaliatory harassment, thus allowing her to seek relief for a series of related acts of workplace harassment that might be time-barred if considered independently. We affirm the dismissal of her claim for retaliatory discharge as untimely. Because we believe that English's claim of workplace harassment is one cognizable under the EPS and may constitute a continuing violation for statute of limitations purposes, we remand that claim for first instance consideration by the Secretary of Labor.

I

GE operates an NRC licensed fuel production facility in Wilmington, North Carolina. The facility is involved in the processing of nuclear materials, including uranium powder, in the course of manufacturing "fuel bundles" for use at nuclear reactor sites. Areas of the facility in which workers handle nuclear materials, and are thus exposed to radiation safety hazards, are designated "controlled areas." The facility's Chemical–Metallurgical Laboratory (Chemet Lab) contains such controlled areas.

From November 13, 1972 until July 30, 1984, English was employed as a lab technician in the Chemet Lab and worked in a controlled area. Her duties included quality control procedures, which required her to analyze the concentration of uranium in samples of uranium powder.

Prior to March 1984, English had made a number of complaints to both GE and the NRC about unsafe conditions and practices in the Chemet Lab. On February 13, 1984, English sent the NRC a list of alleged safety violations in the Lab. The same allegations were brought to GE's attention in a February 24, 1984 letter from English to GE management. GE conducted an internal investigation of the allegations in March 1984 and the NRC conducted an investigation on March 26, 1984. The events leading up to this suit occurred in the interim.

During the first part of the week of March 5, 1984, English worked the 7:00 AM–3:10 PM shift in the Chemet Lab. On Friday, March 9, 1984, she switched to the 11 PM–7:30 AM shift. On Monday, March

5, while going about her duties, English claims to have found radioactive contamination left uncleaned by workers on the prior shift. During the next three days, she again discovered contaminated areas left uncleaned by prior shifts. She believed that the contaminated areas should have been obvious to Lab employees and that workers on the prior shift were careless and relying on her to clean up after them, which she claims to have done several times.

On March 9, English again found contamination in the Lab. Knowing that no supervisor would be available until Sunday, March 11, English marked the contaminated area with red tape, but left it uncleaned. She intended to show the marked area to her supervisor in order to provide proof to GE management of her complaints about the lackadaisical approach to safety of her co-workers. English believed that her prior lack of proof, a result of her repeated efforts to clean up after her co-workers, had caused GE management to ignore her earlier complaints. She noted that the contamination and red tape were still present on Saturday and Sunday, March 10–11, 1984.

On March 11, 1984, English brought the contaminated area to the attention of the supervisor on duty, William Lacewell. She admitted having purposely left the contaminated area uncleaned in an effort to prove her complaints about co-worker malfeasance, but denied having caused the spill herself. While repeating her prior complaints about her co-workers, she also raised other safety concerns, including a complaint about a defect in the Lab's microwave oven which was causing the oven to leak and release fumes. She expressed her frustration with repeatedly having had to clean up after her co-workers and advised Lacewell that she did not intend to continue doing so. She then used a radiation detection device located at the entrance to the Lab to check her work area for further contamination. GE subsequently corrected the microwave oven defect and inspected and cleaned the Lab. These actions necessitated a work stoppage in the affected areas.

As a consequence of these events, disciplinary action was taken against English. Formal charges were made against her in a March 15, 1984, letter, which accused her of:

1. the unauthorized removal of the personal survey instrument from the entrance to the laboratory;

2. the deliberate contamination of a table;

3. failure to clean up contamination, knowing it existed;

4. the continued distraction of other laboratory employees; and

5. disruption of normal laboratory activities.

English was removed from the Chemet Lab, barred from further work in controlled areas, and placed on indefinite temporary assignment in a warehouse at the Wilmington facility to begin March 16, 1984. She was placed on 12 months probation and penalized five days of work without pay. Enforcement of the latter penalty was waived.

English administratively appealed the disciplinary action. Charge one was ultimately dismissed as it was finally determined that Lacewell had given English permission to use the detection device. All other charges, except charge three, were either dropped or it was determined that no action would be taken in regard to them.

Disciplinary action was taken on charge three. English was notified of the final company decision in her case in a May 15, 1984 letter. That letter informed her that (1) she was permanently removed from the Chemet Lab and barred from working in controlled areas, (2) her probationary period was reduced from twelve to six months, (3) her temporary assignment was reduced to 90 days at current salary, during which time she could search for and bid on available positions elsewhere in the facility for which she was qualified, and (4) if she had not secured a suitable permanent position by the end of her temporary assignment, she was to be involuntarily placed on lack

of suitable work status—essentially placed on layoff.[1]

English worked at the warehouse position during her temporary assignment. She alleges that during that period she was regularly surveilled, intimidated, humiliated in front of her co-workers, and otherwise harassed for having made safety complaints against GE. As late as July 24, 1984, GE's Employment Administrator indicated to English that efforts were still being made to place her in a permanent position. Shortly thereafter, she was contacted by GE's Benefits Advisor as to her various benefits as applied to layoff status, since it appeared unlikely that she would find suitable permanent employment by the end of her temporary assignment. This prediction was borne out as English's last day of active employment with GE was on July 27, 1984, and she was removed from the payroll on July 30, 1984.

English then filed a complaint primarily alleging discriminatory discharge with the Department of Labor on August 24, 1984, and an amended complaint on August 27, 1984. Following an investigation of her allegations, the Administrator of the Wage and Hour Division of the Department of Labor concluded that GE had discriminated against English in violation of the EPS. The case was referred to an ALJ when both English and GE appealed the Administrator's decision.

After a hearing, the ALJ found that English was disciplined and ultimately terminated because of her initiation of and participation in the NRC safety investigation of GE. The ALJ specifically rejected GE's contention that English's complaint was untimely under the EPS. He held principally that the triggering violation she proved was her termination from employment on July 30, 1984, as to which her filing was timely. Alternatively, he held that English had established a "continuing violation" which continued into the timely filing peri-

od and allowed her to challenge any earlier effective termination.

The case was submitted for review to the Secretary of Labor, and was referred to a Deputy Secretary. The Deputy Secretary ordered the case remanded for the purpose of taking additional testimony on certain issues. The ALJ determined to proceed by deposition, to which English objected. She refused to comply with the procedure and appealed to the Deputy Secretary for clarification of his remand order. While this exception was pending, the Deputy Secretary issued his final decision, dismissing her complaint as untimely.

This petition for review followed.

## II

English challenges the Secretary's dismissal of her retaliatory discharge claim as time-barred on three grounds. First, and principally, she contends that she was only effectively "discharged" when she was removed from the payroll on July 30, 1984, a time well within 30 days of the filing of her complaint with the Secretary. Second, she contends that if her "discharge" effectively occurred at an earlier date outside the filing period, she may yet avoid the time-bar because any such "discharge" was merely part of a "continuing violation" that extended into the filing period. Finally, she contends that in any event GE should have been found equitably estopped by its conduct to raise any time-bar defense to her discharge claim.

We take these in order.

## A

English's contention that she was only "discharged" on July 30, 1984 runs directly into the problem that what happened on that date was preordained by the earlier disciplinary decision of which she was notified on May 15, 1984. The Secretary found

---

1. English characterizes the ultimate termination of her employment on July 30, 1984, as a "discharge," implying an outright termination then of all employment relations. But the terminal action, as announced in the May 15, 1984, decision and notice, was not "discharge" but, as indicated in text, a "lay-off." The two are technically and practically different in that an employee placed on lay-off retained certain employment benefits and recall rights not retained by one given an outright discharge.

the discharge claim time-barred on exactly this basis, holding that under the rule of *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (Title VII claim); *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (§ 1983 claim), any discharge violative of the EPS occurred on the earlier date, as to which the filing period had long since expired.

English challenges that application of the *Ricks–Chardon* rule to her claim on two grounds: first, that the rule does not generally apply to claims under the EPS, as opposed to Title VII and § 1983, the statutory schemes in connection with which it originated; second, that if generally applicable to EPS claims, it does not apply to her claim on the facts of this case. We disagree with both of these contentions.

### (1)

■ In *Ricks*, the Supreme Court ruled that the administrative filing period for complaints under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*—which requires an employee to file a complaint with the EEOC within 180 days (300 in some circumstances) "after the alleged unlawful employment practice occurred"—begins running on the date that the employee is given definite notice of the challenged employment decision, rather than the time that the effects of the decision are ultimately felt. Shortly after *Ricks*, the Court applied the same rule in the context of a § 1983 suit, stating again that "the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon*, 454 U.S. at 8, 102 S.Ct. at 29 (emphasis in original) (citing *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504). And subsequent cases have extended the *Ricks–Chardon* rule to suits brought under the Age Discrimination in Employment Act (ADEA), which also requires an aggrieved employee to file a complaint with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 29 U.S.C. § 626(d). *See, e.g., Price v. Litton Business Systems, Inc.*, 694 F.2d 963 (4th Cir.1982).

We think the same rationale requires the *Ricks–Chardon* rule's application to the acts of employment discrimination prohibited by the EPS.

Subsection (b)(1) of the EPS identifies the triggering event for timely filing purposes as a "violation of subsection (a)," and subsection (a) identifies the "violations" referred to in subsection (b)(1) as any acts which "discharge any employee or otherwise discriminate against any employee with respect to his ... employment [for retaliatory reasons]." For the same reason that the proper focus in assessing time-bar defenses under § 1983, Title VII, and the ADEA is on the time of the challenged conduct and its notification rather than the time its painful consequences are ultimately felt, so should be the focus in assessing time-bar defenses under the EPS. We so hold rejecting English's contention that the *Ricks–Chardon* rule should not apply to claims under the EPS.

### (2)

■ English's effort to avoid application of the *Ricks–Chardon* rule to the facts of this case, even if it be generally applicable to EPS claims, is based on her contention that the earlier decision on May 15, 1984, as communicated to her, did not have the final and unequivocal quality required to invoke the rule. We disagree.

As English correctly notes, the *Ricks–Chardon* rule is premised on an employee's having been given final and unequivocal notice of an employment decision having delayed consequences. Only upon receipt of such notice does the filing period begin to run. Until that time, there is the possibility that the discriminatory decision itself will be revoked, and the contemplated action not taken, thereby preserving the pre-decision status quo. English claims that the May 15, 1984 letter giving her notice of GE's decision is equivocal because the termination of her active employment depended on whether she secured other suitable employment, a fact which would not be known until the last day of her temporary assignment.

English's argument misses a key point. The notice of the challenged employment decision itself was in form final and unequivocal. There was no intimation in it that the decision was subject to further appeal, review, or revocation, either in whole or in part. Neither did it state or imply that her temporary assignment might be lengthened or made indefinite in duration.

The only uncertainty in the notice related to a possibility of avoidance of the consequences of the decision by means unrelated to its revocation or reexamination by the employer. If English secured other suitable employment before the end of her temporary assignment, she would avoid the ultimate, and most harsh, effect of the May 15, 1984 decision. But the possibility that the effect(s) of a challenged decision might be avoided by such means, does not render the decision equivocal for the purposes here at issue, at least where, as here, the effect can be avoided without negating the alleged discriminatory decision itself.[2] Even had GE "re-hired" English into a new suitable position, such an act would not have erased and made non-actionable the May 15, 1984 disciplinary action. We therefore hold that notification of the May 15, 1984, decision triggered the limitations period with respect to English's claim of retaliatory termination of her employment.

B

■ English next contends, relying principally upon *Bruno v. Western Elec. Co.,* 829 F.2d 957 (10th Cir.1987), that if *Ricks–Chardon* compels treating the May 15, 1984, decision as the event marking her effective "discharge," she has alternatively alleged and proved a "continuing violation" extending into the charge period so that she may challenge that earlier termination decision as an element of the "continuing violation." We disagree; "continuing violation" theory cannot be stretched to give such a result.

A key distinction between *Bruno* and this case is that in *Bruno* the employee never "retired" under pressure nor was involuntarily terminated, hence was not challenging his "discharge." Instead, the *Bruno* employee had simply declined to yield to the employer's continued efforts to force his retirement. In that circumstance, the employee was not claiming either a constructive or actual discharge as a violation of protected employment rights, and the "continuing violation" theory was instead drawn upon to open to challenge a series of related coercive acts, some of which would have been time-barred if treated as discrete, consummated violations.

Here, by contrast, as earlier noted, the May 15, 1984 decision as then effectively communicated to English was a discrete violation of English's right not to suffer retaliatory discharge (assuming that it was so motivated). Such a consummated, immediate violation may not be treated as merely an episode in a "continuing violation" because its effects necessarily carry over on a "continuing" basis. So to hold would of course effectively scuttle all time-

---

**2.** The Sixth Circuit recently reached the same conclusion on this question. In *Janikowski v. Bendix Corp.,* 823 F.2d 945 (6th Cir.1987), an employee challenged his discharge under the ADEA. The district court ruled that the claim was untimely under the *Ricks–Chardon* rule. The employee sought to avoid the *Ricks–Chardon* time bar by arguing that the notice of his termination was not "definite and final." *Janikowski,* 823 F.2d at 947. His employer had notified him on September 4, 1980 that his employment would terminate on September 31, 1981 unless he had found other employment in the company by then. The Sixth Circuit rejected the challenge, holding that the notice was sufficient to trigger the running of the filing period under the ADEA. *See id.* ("Plaintiff's seeking a new position within the company be-

fore his last day of work ended did not toll the period of limitations.").

That this is the necessary implication of the *Ricks–Chardon* rule was recognized by Justice Brennan, dissenting in *Chardon:*

The thrust of the Court's decision is to require a potential civil rights plaintiff to measure the time for filing his claim from the moment some form of injunctive relief first becomes available. The effect of this ruling will be to increase the number of unripe and anticipatory lawsuits in the federal courts—lawsuits that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy.

*Chardon,* 454 U.S. at 9, 102 S.Ct. at 30.

liness requirements with respect to any discrete violation having lasting effects—as presumably all do to some extent.

### C

■ English's invocation of equitable estoppel principles is likewise unavailing here. Though those principles must be available in an appropriate case to avoid a time-bar defense to a claim under the EPS, this is not such a case. The relevant principle is the same we have recognized in ADEA cases, where we have taken a restrictive approach in deference to the balance we think Congress has struck between employer and employee interests in the timing of claims.

Our rule with respect to equitable estoppel as a means of avoiding the bar of untimely filing under the ADEA, hence also under the EPS, was laid down in *Price v. Litton Business Systems, Inc.*, 694 F.2d 963 (4th Cir.1982). There we held that its invocation required a showing that an "employee's failure to file in timely fashion is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Id.* at 965. We specifically noted that "[a]n employee's hope for ... a continuing employment relationship ... cannot toll the statute absent some employer conduct likely to mislead an employee into sleeping on his rights." *Id.* at 965–66 (citations omitted).

We reaffirm this principle here. Absent evidence that the employer acted to deceive the employee as to the existence of its claim or otherwise to mislead or coerce the employee into not filing a claim in a timely fashion, we will not find the employer equitably estopped to plead the bar of untimely filing. Under this rule, even an employer's confirmation of that hope could not estop the employer absent some indication that the promise was a quid-pro-quo for the employee's forbearance in filing a claim.

Such evidence is not present here. English points to GE's repeated reassurances that permanent placement was being sought elsewhere in the company as one ground supporting her claim of equitable estoppel. But this conduct is similar to that of the employer in *Price*, who promised all reasonable efforts to place a terminated employee in a new position within the company. English makes no claim that GE explicitly told her, or otherwise led her to believe, that its relocation efforts somehow depended on English's forebearance from filing a claim of discrimination against it. English also notes the assertions of a GE executive that GE did not intend to fire her. But again, this is not the kind of conduct that equitably estops under our rule. Aside from the fact that technically the statement was accurate—the termination action of which English was notified was, as indicated, layoff rather than outright discharge from all employment—the assertion contained no suggestion that it was a quid pro quo for forbearance from suit. That, as indicated, is the critical element giving rise to estoppel under our rule, and it is missing here.

### III

■ Closely related to English's "continuing violation" theory advanced as a means of opening her May 15, 1984, "discharge" to challenge, is a claim of continuing violation separate from and independent of her barred "discharge" claim: that she was subjected to a continuing course of harassment while she was on "probationary," "temporary assignment" status following the May 15, 1984, disciplinary decision. That harassment theory as a basis of independent claim was never addressed by either the ALJ or the Secretary, possibly because it was not alleged with as much precision as it might have been. Conceding the imprecision, we nevertheless think that it was sufficiently raised to require our consideration of the question whether a claim for "retaliatory harassment" is independently cognizable under EPS, and if so whether that alleged here requires a consideration on the merits not yet given it.

Addressing the issue of general cognizability as one of first impression, we hold that such a claim lies under the EPS. We do so by directly analogizing from the Su-

preme Court's recognition of such an independent claim of race- or gender-based harassment under Title VII in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64–67, 106 S.Ct. 2399, 2404–2406, 91 L.Ed. 2d 49 (1986). There the Court found in Title VII's prohibition of race- or gender-based discrimination in any "terms, conditions, or privileges of employment," a prohibition against race- or sex-based harassment sufficiently onerous to create a "hostile work environment" for the targets of the harassment.[3] We think that the same must be found in the EPS's prohibition, in subsection (a), of any retaliatory "discriminat[ion] against any employee with respect to his ... terms, conditions, or privileges of employment." 42 U.S.C. § 5851(a). While it may well be thought that the interests protected by Title VII—freedom from race- and gender-based discrimination in employment practices—are more profound than are those protected by subsection (a) of the EPS—freedom from discrimination for "whistleblowing"—Congress has used exactly the same language to define the nature and range of the prohibited discrimination. And the *Meritor* Court's focus in finding the creation by harassment of "a hostile work environment" a form of prohibited "discrimination" under Title VII was more upon the statutory language defining the discrimination prohibited than upon its specific motivation. *See Meritor*, 477 U.S. at 64–67, 106 S.Ct. at 2404–2406. As the Court put it: "Without question, when a supervisor sexually harasses a subordinate because of that subordinate's sex, that supervisor 'discriminates' on the basis of sex." *Id.* at 64, 106 S.Ct. at 2404. For this, read, as we believe we must: "When a supervisor harasses a subordinate because of that subordinate's protected 'whistleblowing' conduct, that supervisor 'discrimi-

nates' on the basis of the protected conduct."

Additionally, there is no impediment to such an interpretation arising from any remedial limitations in the EPS. In addition to injunctive and restitutionary relief, compensatory damages may be awarded under subsection (b)(2)(B) of the EPS.

In light of this holding, we will remand the case to the Secretary for first instance consideration of English's separate claim of discrimination by retaliatory harassment.[4] In remanding, we of course express no opinion either upon the merits of the claim alleged, or upon any defenses, including limitation defenses, that may be interposed. In considering the claim, the Secretary should be guided by the *Meritor* Court's discussion of the nature and degree of harassment required to create an "abusive or hostile work environment" amounting to discrimination. *See Meritor*, 477 U.S. at 67, 106 S.Ct. at 2406.

AFFIRMED IN PART; REMANDED IN PART FOR FURTHER PROCEEDINGS.

RUSSELL, J., concurs in that portion of the judgment which affirms dismissal of the claim of retaliatory discharge, and in Parts I and II of the majority opinion. He dissents from that portion of the judgment which remands the claim of retaliatory harassment, and from Part III of the majority opinion. He would affirm dismissal of the latter claim as well, on the basis that it too is time-barred.

---

**3.** While *Meritor* dealt directly only with sexually-based harassment, it explicitly approved the decisions of various lower federal courts holding that Title VII prohibited discrimination by race-based harassment sufficient to create a "hostile or abusive work environment." *See Meritor*, 477 U.S. at 65–66, 106 S.Ct. at 2405–2406.

**4.** English challenged the ALJ's refusal to allow the presentation of live testimony on the Secretary's aborted remand, and renewed that challenge before us. In view of our remand for first instance consideration of her harassment claim while affirming the dismissal of her "discharge" claim, we assume that this challenge is mooted. Clearly, upon any remand by the Secretary to an ALJ, the question of the form of proceedings before that officer will be an open and new one.