748 A.2d 1141 (2000)
330 N.J. Super. 30
Ralph W. HOLMIN, Plaintiff-Appellant,
v.
TRW, INC., Carmine Coppola, Ruth E. Miller, Arthur B. Branstine, and Synnex Information Technologies, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 1999.
Decided April 7, 2000.
*1142 Lehman, Lehman & Gruber, Livingston, for plaintiff-appellant (David J. Gruber, of counsel and on the brief).
Littler Mendelson, Morristown, for defendants-respondents (Scott J. Wenner, of counsel; Mr. Wenner and Jared M. Freedberg, on the brief).
Before Judges MUIR, Jr., WALLACE, Jr., and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
Plaintiff, Ralph W. Holmin, appeals from a judgment dismissing his claim that defendants had fraudulently induced him to leave his prior job and accept employment with defendant TRW, Inc. TRW). The dismissal was based on application of a six year statute of limitations and a determination that the limitation period began to run when plaintiff was told that his employment was to be terminated, rather than thirteen days later, when he completed his last day of work. While the precise issue is one of novel impression in this State, we are satisfied that under settled principles, a statutory limitation period respecting a cause of action does not commence until that cause of action accrues; that the cause of action alleged here (fraud) accrued only when plaintiff was damaged by the actual termination of his *1143 employment; and that, accordingly, the six-year period began to run on plaintiff's last day of work. Since the complaint was filed within six years of that date (although more than six years after plaintiff was told he was to be terminated), we reverse the dismissal of the complaint.
The trial court's decision came in response to a motion under R. 4:6-2(e) to dismiss plaintiff's complaint for "failure to state a claim upon which relief can be granted." On such a motion, all well pleaded allegations of the complaint are accepted as true and the matter is to be resolved based on the pleadings themselves. See Rieder v. State Dept. of Transp., 221 N.J.Super. 547, 535 A.2d 512 (App.Div.1987); see also Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 536 A.2d 237 (1988). On that basis, the operative facts of the case can be simply stated.
At some point prior to November 11, 1991, the individual defendants, Carmine Coppola, Ruth E. Miller and Arthur B. Branstine (all "upper management" personnel with the Customer Service Division (CSD) of TRW), solicited plaintiff to leave his job with Mitsubishi Bank and come to work for TRW. They assured him that,
such employment would be continuous and terminable only for just and sufficient cause and that if plaintiff conscientiously and diligently performed his job duties he would have a secure future with CSD and TRW. They did not tell him that CSD was having financial difficulty, that it was being considered for sale, that plaintiff's [intended] position... would be eliminated within a short time after his employment, ... that plaintiff's security with TRW and/CSD would almost immediately be in jeopardy upon beginning employment, and that plaintiff would be chosen for termination shortly after beginning employment because both he and his position would be deemed to have the "least impact" upon CSD's business needs in regard to a reduction in it's workforce.
In addition, plaintiff charged,
during the interview process defendant Ruth Miller specifically told plaintiff that because he was the only person in his department there was no chance that he could be laid off.
Plaintiff asserts that in reliance on those representations, he left Mitsubishi and accepted the job with TRW. He also charges that none of defendant's statements were true. In fact, CSD was experiencing financial difficulties at the time, and TRW was considering selling the division. In addition, he claims he was hired to undertake a particular project, and that TRW/CSD intended to terminate his employment once that job was completed. The job security he was promised was non-existent, and shortly after working with TRW, his position was eliminated. He asserts that had he known the truth, he would never have left his prior job and begun a new position with TRW. That move, he says, was induced by defendants' false and fraudulent representations which were made with knowledge that they were false and with the intention that he act upon them. He also says that in fact, he did act upon them. In its key provision, as it relates to the statute of limitations, plaintiff's complaint states that,
on or about February 28, 1992, defendant, through its authorized agents and employees, advised plaintiff that his position was being eliminated and that he was being terminated by CSD and defendant TRW effective March 13, 1992 which was the last date of plaintiff's employment.
It concludes that,
As a direct and proximate result of the defendants' fraudulently inducing plaintiff into its employment and misrepresenting the solvency of and financial integrity of CSD and plaintiff's security within same, plaintiff incurred and has suffered and continues to suffer definite *1144 and substantial detriment as a result of his reliance and termination.
On defendants' motion to dismiss the complaint,[1] the court was presented with a letter dated February 28, 1992, from TRW to plaintiff, headed "Separation Arrangements." [2] The letter, signed by defendant Miller who is identified as "Regional HR" (presumably Human Resources) Manager, begins by saying, "This letter will confirm your discussion with Carmine Coppola and provide a summary of your separation arrangements." The first paragraph is entitled "Notice Period" and in its significant portion says:
Your last day of work will be March 13, 1992. Although this is the official last day worked, in most cases there is no general expectation that you will report to work for the entire notice period, even though you will be paid for the entire notice period. You are encouraged to effect closure in your work area as soon as possible in order to be able to use the remaining time for your own transition issues. During this time, Human Resources will provide you with support in your job search,....
The letter also includes a paragraph entitled "Problem Resolution Process," reading as follows:
If you have any questions about your selection for layoff, you are encouraged to contact your Regional Human Resources Manager. If you wish to file a complaint, your Regional Human Resources Manager will explain CSD's Employee Grievance process.
On March 10, 1992, plaintiff filed such a grievance. On March 13, 1992, he worked his last day with TRW. On April 15, 1992, his grievance was denied.
Plaintiff filed his complaint on March 11, 1998less than six years after his last day of work, but more than six years after the February 28, 1992 letter. He claims the six year statute of limitations contained in N.J.S.A. 2A:14-1, should be measured from his last day of work, March 13, 1992, rather than February 28, 1992. Alternatively, he claims that the limitation period should have been equitably tolled while his grievance was pending between March 10, 1992 and April 15, 1992. Since we agree with plaintiff's first contention, we need not resolve the second.

I
The statutory language and well-established case law, make clear that the six year statute of limitations period is to be measured from the date a plaintiff's cause of action accrues. See N.J.S.A. 2A:14-1:
Every action at law for ... any tortious injury to the rights of another ..., shall be commenced within six years next after the cause of any such action shall have accrued.
See also Fernandi v. Strully, 35 N.J. 434, 449, 173 A.2d 277 (1961); Hartford Accident and Indem. Co. v. Baker, 208 N.J.Super. 131, 135-36, 504 A.2d 1250 (Law Div. 1985). It is also clear that the date when a cause of action is deemed to have "accrued" is "the date upon which the right to institute and maintain a suit first arises." *1145 Hartford, supra, 208 N.J.Super. at 135-36, 504 A.2d 1250.
Here, the asserted cause of action is fraud, which is sometimes called "deceit." The essential elements of that tort have been set out in countless cases. See, e.g., Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997), describing the five elements as,
(1) a material misrepresentation of a pre-sently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.
See also Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 626, 432 A.2d 521 (1981); Louis Schlesinger Co. v. Wilson, 22 N.J. 576, 585-86, 127 A.2d 13 (1956)(referring to the "proverbial" five elements of deceit).
Thus, "[a]ctual damages are an element of the cause of action for fraud or deceit." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 189 N.J.Super. 347, 354, 460 A.2d 161 (App.Div.1983), aff'd in part and rev'd in part, 97 N.J. 37, 477 A.2d 1224 (1984);[3]see also Labus v. Navistar Int'l Transp. Corp., 740 F.Supp. 1053 (D.N.J. 1990) (applying New Jersey tort law). Until a plaintiff has suffered "damages," therefore, he cannot maintain a suit for damages based on fraud since his cause of action has not yet accrued. It will accrue only when "damage" is inflicted.
Here, the "damage" which formed an essential part of plaintiff's cause of action occurred only when plaintiff's employment ended, on March 13, 1992. Before that, plaintiff had suffered no detriment. He had only been told that in the future his employment would terminate and thus, he would suffer a detriment. The February 28 letter simply told him that March 13, 1992thirteen days hence"will be" your last day of work. In fact, the entire February 28, 1992 letter is couched in the future tense. It begins by telling plaintiff what "will be" his last day of work. It tells him what Human Resources "will provide"; what he "will receive" by way of vacation pay; what insurance benefits "will continue" and for how long; and it continues in that vein. It concludes by telling plaintiff of a possible "retirement option" and tells him he must elect that option (if he chooses to do so) within "31 days of your last day worked."
Indeed, it is virtually self-evident that the injury inflicted upon plaintifftermination of his employmentoccurred on March 13, 1992. Defendants' own brief and Case Information Statement accurately describe what happened on February 28, 1992, by saying that on that day, plaintiff was "advised by TRW of its decision to eliminate his position ... effective March 13, 1992 exactly two weeks hence " (emphasis added).
In short, before March 13, 1992, plaintiff had suffered no damage. Such damage is essential to a fraud claim, and thus plaintiff's cause of action did not accrue until March 13, 1992. Accordingly, the six year limitation period respecting his suit also began on March 13, 1992, it expired on March 12, 1998, and thus his March 11, 1998 complaint was timely.

II
Notwithstanding the foregoing, defendants claim that under "well established law," the statutory limitation period for plaintiff's complaint must be measured from the date plaintiff was told he would be terminated, February 28, 1992. However, the "well established law" on which *1146 defendants rely consists only of a single line of federal cases dealing with specific statutesprimarily civil rights enactments, including the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. § 621 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. Moreover, those decisions were mandated by one, or at most two, decisions of the United States Supreme Court, and none of them contains a persuasive analysis as to why we should adopt the rule urged by defendants: that a cause of action based on a wrongful discharge should be deemed to accrue not when the plaintiff is actually terminated but rather when he is told he is going to be terminated.
The first of those Supreme Court cases is Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed. 2d 431 (1980). There, plaintiff, an African-American professor, was denied tenure on June 26, 1974. Pursuant to its standard policy respecting non-tenured faculty members, plaintiff's employer then offered him a "terminal" contract to teach one additional year. Plaintiff accepted the offer, signed the one year terminal contract and thus continued teaching until June 30, 1975. At that time, when the one year contract period ended, his employment also ended.
Thereafter, plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) and subsequently filed suit in the United States District Court. Defendant moved to dismiss, claiming that plaintiff had failed to comply with applicable time limits which require that he file his EEOC complaint within 180 days "after the alleged unlawful employment practice occurred" and file his suit within three years of that date. The Supreme Court agreed, holding that because plaintiff was late with both his EEOC complaint and his district court complaint, his suit must be dismissed.
The critical issue, said the Court, turned on identifying the "unlawful employment practice" of which plaintiff complained. The Court noted that the complaint focused almost entirely on the "decision to deny Ricks tenure," id. at 254-55, 101 S.Ct. at 502, 66 L.Ed.2d at 437, and contained no allegation of discrimination respecting termination of plaintiff's employment after tenure had been denied. The Court concluded that:
If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts.
[449 U.S. at 257, 101 S.Ct. at 504, 66 L.Ed.2d at 439.]
The Court also noted that,
Termination of employment at Delaware State is a delayed but inevitable, consequence of the denial of tenure.
In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants....
In sum, the only alleged discrimination occurredand the filing limitations periods therefore commencedat the time the tenure decision was made and communicated to Ricks. That is so even though one of the effects of the denial of tenurethe eventual loss of a teaching positiondid not occur until later.
[449 U.S. at 258, 101 S.Ct. at 504, 66 L.Ed.2d at 439-40.]
Thus, the Court treated Ricks as a case alleging wrongful denial of tenurenot wrongful discharge. The tenure denial had predated the actual termination of employment, and, as the Court viewed the matter, the plaintiff had not even complained of his actual discharge. On that *1147 basis, the holding of Ricks hardly seemed exceptional.[4]
One year after Ricks, the Supreme Court decided Chardon v. Fernandez, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), which involved twenty-three administrators in the Puerto Rico Department of Education who alleged they had been improperly terminated for political reasons. At some time between June 3 and June 17, 1977, the plaintiffs were told their appointments would expire at the "termination of the present school year," and each was given a termination date between June 30 and August 8, 1977. On June 19, 1978, plaintiffs filed suit under 42 U.S.C. § 1983, based on alleged unlawful termination. The applicable statute of limitations prescribed a one year limit, and thus the complaint was timely if the one year was measured from the actual termination of employment, but late if it ran from the date plaintiffs were told their appointments would end.
The First Circuit Court of Appeals refused to dismiss the suit. Fernandez v. Chardon, 648 F.2d 765, 768-69 (1st Cir. 1981). It concluded that Ricks was inapplicable because Ricks dealt with a denial of tenure whereas the plaintiffs in Chardon alleged an unlawful termination. As discussed below, the court also referred to what it saw as compelling policy reasons to measure the statutory limitation period from the actual termination of employment, rather than from an earlier date when the plaintiffs were told they would be terminated at some point in the future.
The Supreme Court reversed. It found Ricks "indistinguish-able," saying that,
When Ricks was denied tenure, he was given a 1-year "terminal" contract. Thus, in each case, the operative decision was madeand notice givenin advance of a designated date on which employment terminated.
In Ricks, we held that the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful. The fact of termination is not itself an illegal act. In Ricks, the alleged illegal act was racial discrimination in the tenure decision. Here, respondents allege that the decision to terminate was made solely for political reasons, violative of First Amendment Rights. There were no other allegations, either in Ricks or in these cases, of illegal acts subsequent to the date on which the decisions to terminate were made.[5]
[Chardon, supra, 454 U.S. at 8, 102 S.Ct. at 29, 70 L.Ed.2d at 9 (citations omitted).]
Following Ricks and Chardon, federal courts have, of course, applied those holdings whenever an issue arose as to the running of a statute of limitations in a Title VII or ADEA case. Not surprisingly, since all were bound by Ricks and Chardon, few of those decisions discussed the pros and cons of the Court's holdings, the policy behind the decisions, or the fact that the principle initially relied on in Ricks was substantially different from that applied in Chardon. See Economu v. Borg-Warner Corp., 829 F.2d 311 (2d Cir.1987); Mull v. ARCO Durethene Plastics, Inc., 784 F.2d 284 (7th Cir.1986); Miller v. International Tel. and Telegraph Corp., 755 F.2d 20 (2d Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); Slenkamp v. Borough of Brentwood, 603 *1148 F.Supp. 1298 (W.D.Pa.1985), aff'd, 826 F.2d 1057 (3d Cir.1987).
One case that did include such discussion, albeit in a convoluted context, is Janikowski v. Bendix Corp., 823 F.2d 945 (6th Cir. 1987). There, the court concluded that in the case before it, the Ricks/Chardon rule applied to an employment discrimination claim under federal law, but a different rule applied to a charge that the alleged discrimination also violated Michigan state law.
In Janikowski, plaintiff received a notice on November 18, 1980, advising that his position would terminate on September 30, 1981. Following an extension of the September date, Janikowski's employment ended on November 30, 1981. On May 14, 1982, he filed a complaint alleging age discrimination in violation of both the federal ADEA and Michigan's Civil Rights Act. The suit was timely under both acts if the limitation period was measured from the 1981 termination date; it was untimely under both if the 1980 notice date was applied. The district court applied the 1980 date, concluded that the suit was untimely, and thus dismissed plaintiff's complaint.
The Court of Appeals cited Ricks and Chardon as holding that "a plaintiff's cause of action under the ADEA accrues when he receives a notice of a termination, not when his employment actually ceases." Id. at 947. On that basis it held that under federal law, the limitation period commenced running on September 4, 1980, and thus plaintiff's ADEA claim was time barred.[6]
The court then turned to the claim under Michigan's Civil Rights Act, saying that it was required to use its best efforts to "divine what the Michigan high court would say if faced with the [statute of limitations] issue." Id. at 948. The court concluded:
Our guess is that if it were confronted with the issue before us, the Michigan Supreme Court would veer away from the current federal precedent and declare that the period of limitations for the plaintiff's ... [state] claim began to run the date plaintiff actually stopped working, November 30, 1981.

[Id. at 949.]
The court reached that conclusion based on two decisions by the Michigan intermediate appellate court (the Court of Appeals) and dicta from one decision of the State Supreme Court. All pointed out difficulties with the Ricks/Chardon rule and noted the advantages of a contrary rule focused on an employee's last day of work.
The first case referred to was Michigan Department of Civil Rights ex. rel. Zlotogura v. City of Muskegon, 100 Mich.App. 557, 298 N.W.2d 760 (1980), which, ironically, cited and followed the Third Circuit decision in Ricks, before Ricks was reversed by the Supreme Court.[7] The court referred to two bases for the Third Circuit's decision, both of which it found persuasive. First, it noted that,
A seemingly final decision may be reconsidered and sometimes reversed, and it is not desirable to encourage the initiation of litigation which could preclude the possibility of reconsideration.

[Ibid.]
Second, said the court,
from a practical point of view, a rule which requires an employee actually to cease ... employment in order to trigger the running of the statutory limitation *1149 period serves as a bright guideline for both the courts and the victims of discrimination ... since the date on which an employee ... discontinues working ... is readily apparent to all concerned.

[Ibid.]
The second Michigan case cited in Janikowski was Northville Public Schools v. Michigan Civil Rights Commission, 118 Mich.App. 573, 325 N.W.2d 497 (1982). That case involved an allegedly discriminatory school board policy barring use of sick leave for maternity leave purposes. The appellate court reversed a ruling that the statute of limitations began running when the school board announced the policy, rather than when it applied that policy to deny plaintiff's request for use of her accumulated sick days. It distinguished the Supreme Court's decision in Ricks[8] and held that,
the limitation period began "after the alleged act of discrimination." It is an act of discrimination which starts the running of the limitation period, not a mere threat to discriminate or an announcement of an intention to discriminate.

[Id. at 500.]
Finally, the Janikowski court quoted critical language from the Michigan Supreme Court describing the Ricks/Chardon rule as creating "a great deal of confusion":
The dissent in Ricks addressed the problems created by this early accrual date. First, it creates a difficult line-drawing problem for the courts, as they must determine when notice has been given. Second, it encourages litigation, rather than internal resolution. Third, the lack of a bright line will confuse wronged individuals and limit the remedial value of Title VII.
[Janikowski, supra, 823 F. 2d at 950 (quoting Sumner v. Goodyear Tire & Rubber Co., 427 Mich. 505, 398 N.W.2d 368, 379 (1986)).]
The "most sensible rule," Justice Stevens had said (and the Michigan Supreme Court seemed to agree),
would provide that the date of discharge establishes the time when a cause of action accrues and the statute of limitation begins to run. Prior to that date, the allegedly wrongful act is subject to change. More importantly, the effective discharge date is the date which can normally be identified with the least difficulty or dispute ... Both the interest in harmonious working relations during the terminal period of the employment relationship, and the interest in certainty... support this result.

[Ibid.]
Before the Supreme Court announced its Ricks/Chardon holdings, a number of federal courts had rejected such a rule, with many of those decisions raising the same issues just noted. Thus, in Ricks itself, the Third Circuit Court of Appeals had cited its own earlier decision in Bonham v. Dresser Industries, Inc., 569 F. 2d 187 (3d Cir.1977), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), and concluded that the statute of limitations should run only from the date of plaintiff's actual termination of employment. Ricks v. Delaware State College, 605 F.2d 710 (3d Cir.1979), rev'd, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). The court noted that a contrary rule (i.e., the one ultimately adopted by the Supreme Court) had several drawbacks: First, it said, "even a casual review of the cases in this area reveals instances in which seemingly final decisions [to terminate employment] have been reconsidered and sometimes reversed." Id. at 712. It also noted that it is "not desirable to encourage the initiation of litigation that might thwart any *1150 internal processes of conciliation and reconsideration." Ibid. Such a rule would be likely to "unnecessarily add" cases to the courts' docket that might otherwise be amicably resolved, and would also force an employee to hire a lawyer or start suit at a time when it would be "likely to have the negative side effect of reducing that employee's effectiveness during the balance of his or her term." Ibid. And, as a "compelling practical consideration" for the rule it adopted, the Third Circuit noted that a rule which commences running of the limitation period from the date of termination of employment,
provides a bright line guide both for the courts and for the victims of discrimination. Under the ... [contrary] formulation, courts would have to determine when purportedly final decisions are really final and when a reasonable person would really know or have reason to know that a final decision had been made. Besides creating complexity and thereby increasing the cost of litigation, this approach is likely to become a trap for employees who, through attempts at internal resolution of their grievances, would unwittingly lose the opportunity to make a timely filing of their charge.

[Id. at 712-13.]
As noted, the Second Circuit adopted the same pre-Ricks rule in the related cases of Egelston v. State University College of Geneseo, supra, and Noble v. University of Rochester, supra. And the First Circuit did the same in Fernandez v. Chardon, supra, (before that decision was reversed by the Supreme Court) noting that,
it could be argued that the unlawful act was the making of the decision, rather than the implementation of it. But we think such a refined rule would depart too sharply from the understanding of ordinary people. The plaintiffs in these cases are complaining that they were demoted or discharged, not merely that a decision was made on a particular occasion, of which notice was then given, to take such action against them. Had the decision been made but not yet implemented, equitable relief might have been sought to forestall irreparable harm, but it is unlikely that plaintiffs would have sought or received damages until or unless the threatened action was consummated. The alleged unlawful act was revocable, incomplete and, for practical purposes, nonexistent until the actual demotion or discharge.

[Id. at 768-69.]
Moreover, said the court,
important policies of judicial administration favor a rule based on the date of implementation. While the date of notice in the present cases was easily established, other cases would surely arise in which resolution of that question would require lengthy proceedings. Notice might be oral, or it might be ambiguously phrased, or it might be transmitted by one whose authority is subject to question. We see no value in requiring courts and parties to devote their resources to litigating the adequacy of notice, when the date of the action itself is easily determined.

[Id. at 769.]
See also, among other circuits adopting the same position prior to the Supreme Court decisions, Rubin v. O'Koren, 621 F.2d 114, 116 (5th Cir.1980); Krzyzewski v. Metropolitan Gov't, 584 F.2d 802, 806 (6th Cir. 1978); Moses v. Falstaff, 525 F.2d 92, 95 (8th Cir.1975).
It is striking to realize that in none of the cases we have seen is there any clear response to the objections raised to the Ricks/Chardon rule. Indeed, those objections seem almost self-evident. Certainly, a reading of the cases indicates that the concern expressed over confusion as to when notice of a discriminatory act was given, is realistic. See, e.g., Economu v. Borg-Warner Corp., supra, where a corporate merger placed plaintiff's employment in question; there were no less than five oral or written communications which could be deemed to constitute notice of *1151 future termination; the court spent four pages discussing the issue; and it finally concluded that the critical date was ten days before plaintiff's last day of work, and he had filed his complaint one day too late; Mull v. ARCO Durethene Plastics, Inc., supra, where plaintiff was first told orally on April 18, 1979, that he was to be terminated on May 14, 1979, the parties then discussed possible transfers and other alternatives over the next eight months; the first written notice was given plaintiff on December 6, 1979; and he worked his last day on December 31, 1979. The court's discussion of the issue covered nine pages. Finally concluding that on May 2, 1979, plaintiff had been "unequivocally (albeit orally) told he would be terminated," and thus the statute of limitations ran from that day. And see, for a comparably lengthy and complex discussion, Miller v. International Tel. & Telegraph Corp., supra.
We see no reason to adopt the arbitrary rule of Ricks and Chardon. As noted, neither those cases nor any of the decisions that follow them contain any persuasive discussion of a sound policy basis for selecting that rule. On the other hand, the federal cases that precede Ricks and Chardon, and the Michigan cases cited above, set out what we consider compelling reasons for a contrary rule.
First, until an employee is actually terminated, a "seemingly final decision" may well be reconsidered and perhaps reversed. There is no reason to encourage litigation which might "preclude the possibility of reconsideration." See Zlotogura v. City of Muskegon, supra, 298 N.W.2d at 760.
Second, a rule which triggers running of the limitation period on the date of actual termination provides a "brightline" date and eliminates much of the tortuous litigation and hairsplitting involved in so many of the cases noted above, where courts had to determine when an employee knew or should have known that he was definitely going to be terminated.
In addition, a rule which dates running of the limitation period from the actual termination of a plaintiff's employment conforms with a basic proposition of our law: a cause of action accrues when a plaintiff has been injured or damaged. Prior to that date, he or she is faced only with an anticipation of possible injury, which may or may not occur, depending upon whether the employee is actually terminated.
For all these reasons, we are satisfied that the running of the statute of limitations here should be measured from the date when plaintiff was damaged by the defendant's wrongful act, that the statutory limitation period began to run on plaintiff's last day of work, and thus the dismissal of his complaint was error.

III
Defendant argues that the Ricks/Chardon rule has already been accepted by the courts of this State because those cases are simply applications of the discovery rule which has long existed in this State, and because the Ricks/Chardon holdings were approved by this court in Nissman v. Board of Educ. of Long Beach Island, 272 N.J.Super. 373, 640 A.2d 293 (App.Div.), certif. denied, 137 N.J. 315, 645 A. 2d 142 (1994). We disagree.
The "discovery rule" was first adopted by our Supreme Court in Fernandi v. Strully, 35 N.J. 434, 173 A.2d 277 (1961), a medical malpractice case in which a foreign object was left inside a patient following surgery, and the patient did not learn of its existence until the normal statute of limitations period had expired. The Court noted that, theretofore, "Most courts, including those in New Jersey, have taken the position that where a plaintiff suffers damage as a result of the defendant's wrong he may be barred though he does not, during the customary period of limitations, know or have any reason to believe that he has a cause of action." The Court *1152 noted the inequity of that rule, rejected it, and instead held that,
the period of limitations ... should fairly and justly be said to begin to run when the plaintiff knows or has any reason to know about the foreign object and the existence of the cause of action based on its presence;
....

[Id. at 450, 173 A.2d 277.]
In Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973), the Court again discussed the "discovery rule," noting that decisions following Fernandi had "gone much further and have acknowledged the relevance of the doctrine whenever equity and justice have seemed to call for its application." Id. at 273, 300 A.2d 563. The discovery rule, said the Lopez Court, is "essentially a rule of equity":
Like so many other equitable doctrines it has appeared and is developing as a means of mitigating the often harsh and unjust results which flow from a rigid and automatic adherence to a strict rule of law. On the face of it, it seems inequitable that an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless. Yet such is the result that must follow if the years of the statute are to be inexorably calculated from the moment of the wrong, whether or not the party aggrieved knows or has reason to know that he has a right of redress.
[Lopez, supra, 62 N.J. at 273-74, 300 A.2d 563.]
See also, for similar statements and comparable applications of the discovery rule, New Market Poultry Farms, Inc., v. Fellows, 51 N.J. 419, 425-26, 241 A.2d 633 (1968); Diamond v. N.J. Bell Telephone Co., 51 N.J. 594, 600, 242 A.2d 622 (1968); Keil v. National Westminster Bank, 311 N.J.Super. 473, 489, 710 A.2d 563 (App. Div.1998); Nester v. O'Donnell, 301 N.J.Super. 198, 204-05, 693 A.2d 1214 (App.Div.1997). And see the Supreme Court's most recent statement of the rule in Mancuso v. Neckles, 163 N.J. 26, 29, 747 A.2d 255 (2000), one of a trilogy of discovery rule cases which also included Gallagher v. Burdette-Tomlin Memorial Hospital, 163 N.J. 38, 42, 747 A.2d 262 (2000); and Martinez v. Cooper Hospital-University Medical Center, 163 N.J. 45, 55, 747 A.2d 266 (2000):
Suffice it to say that the rule's "essential purpose ... is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." Accordingly, the doctrine "postpon[es] the accrual of a cause of action" so long as a party reasonably is unaware either that he [or she] has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity (citations omitted).
[Mancuso, supra, 163 N.J. at 29, 747 A.2d 255 (2000).]
To characterize Ricks and Chardon as applications of that equitable doctrine would misconstrue and pervert the beneficent and equitable principles of the discovery rule. The concept adopted by our Supreme Court, and applied in a variety of cases since 1961, is intended to ameliorate a hardship which would otherwise result from a strict application of the statute of limitations. For equitable reasons, it extendsit does not unrealistically limit the time within which one asserting a claim must state that claim. It holds that even if all the facts giving rise to a claim have occurred, the limitation period will not commence until sometime thereafter if the wronged party neither knew nor had reason to know that he or she had been wronged. It does not call for a limitation period to begin running even before that party has been injured.
Plaintiff's citation of Nissman v. Board of Education, supra, is also unpersuasive. That case involved an unusual chronology in a tenure dispute. A State Board of Education regulation, N.J.A.C. 6:24-1.2(c), barred any challenge to a local *1153 board order if the challenge was not filed within ninety days of receipt of the order. Applying that regulation, this court found that petitioner's complaint was time barred, since it was filed more than ninety days after she was told her contract would not be renewed and thus she would not receive her tenure. It was in that connection that this court cited Ricks and Chardon and said, with regard to the regulation before it, that,
An agency regulation that focuses on the date of the employer's wrongful act as the accrual date for a cause of action, rather than the date on which the consequences of the act is directly felt by the employee (termination), is not inherently arbitrary or capricious.
[Nissman, supra, 272 N.J.Super. at 381,640 A.2d 293.]
We repeat there is nothing "inherently arbitrary or capricious" about the regulation applied in Nissman. This court's citation of Chardon and Ricks simply referred to other situations which had embodied such a rule. The statement dealt only with the validity and applicability of the rule before the court and in no way constituted an opinion that the Ricks/Chardon rule was sound, or represented the law of this State when applied to a common law tort. Nissman has no greater significance.
The judgment dismissing plaintiff's complaint is reversed and the matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] The complaint includes a second count, alleging that after plaintiff's termination by CSD and TRW, TRW sold CSD to defendant Synnex which assumed all of CSD's liabilities and thus "as a successor-in-interest," Synnex is also liable to plaintiff.
[2] The parties do not make clear how the letter and some subsequent correspondence was submitted to the court since, as noted, a motion under R. 4:6-2(e) is to be resolved on the pleadings themselves, without supplementary material. However, R. 4:6-2 states that if "on a motion to dismiss" under R. 4:6-2(e), the court is presented with "matters outside the pleading[s]," and such matter is not excluded by the court, "the motion shall be treated as one for summary judgment." Here, the additional material was not excluded by the court and, presumably, the court treated the motion as equivalent to one seeking summary judgment. For our purposes, the distinction is not significant.
[3] Nappe presented the issue of whether a jury which had awarded only nominal damages on a fraud claim could also award punitive damages. The Supreme Court answered the question in the affirmative, approving a jury instruction which told the jury the alleged fraud was actionable if plaintiff had "sustained damages" even if those damages were "not computable." The holding is consistent with the statement set out abovethat the suffering of some damage is an essential part of the tort of fraud or deceit.
[4] In fact, however, four Justices dissented and one of the four, Justice Stevens, maintained that the Court should have treated the matter as a "discharge case" rather than one dealing only with a denial of tenure. Stevens, J., dissenting, 449 U.S. at 266, 101 S.Ct. at 508, 66 L.Ed.2d at 445.
[5] Three Justices dissented in Chardon. Justices Brennan and Marshall described the case as "plainly distinguishable from Ricks." Chardon, supra, 454 U.S. at 9, 102 S.Ct. at 30, 70 L.Ed.2d at 9-10. The other dissenting opinion, by Justice Stevens, joined by Justices Brennan and Marshall is discussed further below. Id. at 10, 102 S.Ct. at 30, 70 L.Ed.2d at 10.
[6] The court also rejected Janikowski's claim that the September 1980 notice had not been final because he had filed a grievance which might have obviated or delayed his termination. The court held that Ricks had resolved that the notice of termination marks the beginning of the limitation period regardless of whether the notice was equivocal, or may have held out a possibility that termination could somehow be avoided.
[7] The Zlotogura case also discussed two Second Circuit cases with similar holdings: Egelston v. State Univ. College, 535 F.2d 752 (2d Cir. 1976) and Noble v. University of Rochester, 535 F.2d 756, 758 (2d Cir.1976).
[8] The Janikowski court noted that Northville had employed the same reasoning as Zlotogura, and had followed the Third Circuit decision in Ricks even though the Supreme Court had since overruled that decision.