NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2366-15T1

BERKLEY RISK SOLUTIONS,
LLC, and ADMIRAL INSURANCE
COMPANY,

 Plaintiffs-Respondents,

v.

INDUSTRIAL RE-INTERNATIONAL,
INC., a/k/a INDUSTRIAL RE,
and RENE GUTIERREZ,

 Defendants-Appellants.

________________________________________________________________

 Argued March 16, 2017 – Decided September 20, 2017

 Before Judges Espinosa and Suter.

 On appeal from the Superior Court of New
 Jersey, Law Division, Union County, Docket No.
 L-0163-15.

 Jon Rory Skolnick argued the cause for
 appellants (Law Offices of Jon Rory Skolnick,
 attorneys; Mr. Skolnick and Jenntyng Chern,
 of counsel and on the briefs).

 Kevin T. Coughlin argued the cause for
 respondents (Coughlin Duffy, LLP, attorneys;
 Mr. Coughlin and Steven D. Cantarutti, of
 counsel and on the brief).
PER CURIAM

 Plaintiffs, Berkley Risk Solutions, LLC (Berkley or BRS), and

Admiral Insurance Company (Admiral) are, respectively, a provider

of insurance and reinsurance management services, and an excess

and surplus lines insurer in the United States and Puerto Rico.

Defendants contended plaintiffs were obligated to pay or reimburse

them for commissions plaintiffs paid to American Foreign

Underwriters Corp. (AFU), a licensed general agency in Puerto

Rico, to place plaintiffs' insurance in seventy-eight

municipalities in Puerto Rico for policy years 2008-09 and 2009-

10. Defendants now appeal from an order in this declaratory

judgment action that granted summary judgment to plaintiffs. We

affirm.

 I.

 In 2005, Marsh Saldana Inc. (Marsh), the retail broker

appointed by Puerto Rico, was working with AFU to obtain property

and casualty insurance for the municipalities. AFU served as

Marsh's general agency, a position that required AFU to be licensed

as a general agent in Puerto Rico.

 Defendant Industrial Re-International Inc. a/k/a Industrial

Re is a reinsurance intermediary incorporated in New York and New

Jersey. Defendant Rene Gutierrez is Industrial Re's founder and

president. In February 2005, AFU hired Industrial Re for the

 2 A-2366-15T1
purpose of managing public liability insurance proposals for the

municipalities. Because Industrial Re was not a licensed general

agency, Industrial Re could not place insurance policies in the

municipalities without a licensed general agency like AFU.

 After receiving relevant information from Industrial Re,

Berkley submitted a proposal on behalf of Admiral to provide

surplus lines insurance to the municipalities for the 2005-06

policy year. Marsh accepted the proposal and, as a result of

renewals, Admiral provided surplus lines insurance to the

municipalities for the 2005-06, 2006-07, 2007-08, 2008-09 and

2009-10 policy years. Berkley was Admiral's authorized signatory

on each policy.

 2005-06 POLICY COMMISSION

 AFU and Industrial Re agreed to split the commission for the

2005-06 policy through a "Handshake Agreement," which was typical

of their business relationship. Plaintiffs were not parties to

the Handshake Agreement. Gutierrez informed Jeffrey Vosburgh,

president of Berkley, of the Handshake Agreement, and assured him

that if Berkley "were to pay him the [commission] money . . . [it]

would be appropriately shared with [AFU]." Berkley paid the entire

commission of $727,777.75 to Industrial Re "with the intent that

[it] would be shared" with AFU. Pursuant to the Handshake

Agreement, Industrial Re paid AFU its share of $145,555 and kept

 3 A-2366-15T1
the rest.

 2006-07 POLICY COMMISSION

 A dispute arose between Industrial Re and AFU regarding the

commission split for the 2006-07 renewal policy because AFU wanted

a larger percentage of the commission. When attempts to resolve

the dispute amicably failed, AFU filed an action against plaintiffs

and Industrial Re in Puerto Rico alleging, in part, that Industrial

Re agreed to split the 2006-07 policy commission equally with AFU

but refused to sign a written agreement.

 Plaintiffs deposited 50% of the commission owed on the 2006-

07 policy with the court in Puerto Rico and paid the other 50% to

Industrial Re. Plaintiffs were then dismissed with prejudice from

the Puerto Rico lawsuit on October 5, 2006.

 In May 2007, Industrial Re and AFU resolved their dispute and

executed a settlement agreement, in which they agreed the 2006-07

policy commission and any future policies with the municipalities

would be split sixty percent (60%) to Industrial Re and forty

percent (40%) to AFU (Settlement Agreement). The parties also

agreed that upon renewal of the policy, the "(60%) commission or

'fee' corresponding to [Industrial Re] shall be paid directly by

[Berkley]." Plaintiffs were not parties to the Settlement

Agreement. Yet, the Settlement Agreement released plaintiffs

"from any civil, administrative, or any other liability as a result

 4 A-2366-15T1
of the facts, allegations and claims included or not in" the Puerto

Rico action.

 2007-08 POLICY COMMISSION

 On August 23, 2007, Vosburgh emailed Gutierrez and AFU stating

that, in light of the Settlement Agreement, plaintiffs were

"prepared to separately distribute" the commission as long as they

would "legally stipulate" to the percentage of the commission each

was entitled to receive. Both Gutierrez and AFU responded by

email stipulating that the commission distribution was sixty

percent to Industrial Re and forty percent to AFU. Industrial Re

received its sixty percent share of the 2007-08 policy commission

directly from Berkley.

 2008-09 AND 2009-10 POLICY COMMISSIONS

 On March 5, 2008, in anticipation of the 2008-09 policy

renewal, Vosburgh emailed Gutierrez and AFU, expressing

plaintiffs' "interest[] in quoting renewal terms and premium" for

2008-09. The email also attempted to "recap the positions of the

parties" and "provide . . . the opportunity to correct any

misimpressions," stating,

 [Plaintiffs] interpret the [Settlement
 Agreement] between [AFU] and Industrial Re to
 operate in such a way as to legally identify
 Industrial Re as an agent of [AFU] solely with
 respect to the original and renewal placements
 of the municipalities Policy-Contract
 business . . . .

 5 A-2366-15T1
 [Plaintiffs] also interpret the [Settlement
 Agreement] between [AFU] and Industrial Re to
 operate in such a way that in the event of one
 or more renewals of the municipalities account
 by [plaintiffs] then Industrial Re will be
 paid its proportionate share of the renewal
 commission allowed by [plaintiffs] whether or
 not [AFU] has chosen to actively involve
 Industrial Re in the placement of the renewals
 with [plaintiffs]. As before, in the event
 of renewal(s) [plaintiffs] will distribute the
 requisite proportionate share to each of [AFU]
 and Industrial Re. . . .

 [F]or the sake of good order, it is once again
 pointed out that [plaintiff] is not a party
 to the [Settlement Agreement] between [AFU]
 and Industrial Re and cannot be bound by any
 of its terms. Further, as per usual market
 norms [plaintiffs] exclusively reserve[] the
 right to set out the terms, conditions and any
 and all other relevant items comprising the
 framework under which [plaintiffs] will
 operate with respect to any and all business
 which is, or may be, offered to [plaintiffs]
 by either or both [AFU] and Industrial Re.

 [(Emphasis added).]

 However, on April 28, 2008, Vosburgh sent an email to AFU

that Gutierrez was not copied on, which stated, in part:

 Given that [the litigation] was concluded at
 terms that to me would characterize Industrial
 Re as [AFU's] 'agent' (i.e.; acting under
 [AFU's] direction and control) and, given the
 traditional [excess and surplus] market
 protocol that the [excess and surplus] insurer
 must honor the source providing the "first
 complete submission" it would seem that under
 the circumstances . . . if renewed,
 [plaintiffs] would pay [AFU] the entire amount
 of brokerage decided on; and . . . then [AFU]

 6 A-2366-15T1
 would naturally be expected to honor [its]
 obligation to Industrial Re. In any event
 [plaintiffs] do[] not expect to, and will not,
 interfere in any way with the business
 relationship between [AFU] and Industrial Re
 as its contractual agent.

 [(Emphasis added).]

 In August 2008, Vosburgh emailed Gutierrez and AFU regarding

the distribution of the 2008-09 policy commission, asking them to

"legally stipulate" to (1) separate distributions as was done in

2007-08; and (2) the percentage of the commission each is entitled

to under the Settlement Agreement. Gutierrez stipulated to the

separate distributions and the 60/40 split. AFU objected to

separate distributions and the 60/40 split, noting Vosburgh's

April 28 email in which he stated the entire commission would be

paid to AFU. After AFU made Industrial Re aware of its objection,

Gutierrez asked Vosburgh to "handle this matter . . . with the

view of remitting to [Industrial Re] its share of the

comm[ission]." In a later email, however, Gutierrez confirmed

"that [Berkley] alone, can make the decision as to who and how the

comm[ission] for [Industrial Re] and [AFU] should be disbursed."

 On September 19, 2008, Vosburgh emailed Gutierrez, stating,

in relevant part,

 As you are aware, [AFU] was the broker that
 first submitted to [Berkley] a complete
 submission to quote for the 2008-09 year on
 this account. As a result [Berkley] quoted

 7 A-2366-15T1
 and bound coverage with respect to the account
 entirely through the licensed Puerto Rican
 [excess and surplus lines] broker that was
 formally appointed by [Marsh]. All renewal
 terms, conditions and brokerage were
 negotiated and agreed with [AFU]. In light
 of foregoing, and based upon advice of
 counsel, [Berkley]/Admiral will remit the 100%
 of the commission due on this account directly
 to [AFU].

After noting plaintiffs were neither parties to nor involved in

making the Handshake Agreement or the Settlement Agreement between

Industrial Re and AFU, Vosburgh advised Industrial Re to make its

requests for commission to AFU directly. The 2008-09 and 2009-10

policy commissions were paid in full to AFU.

 Industrial Re filed an action against AFU in Puerto Rico

seeking its portion of the 2008-09 and 2009-10 policy commissions.

Plaintiffs were not parties to this action.

 Industrial Re obtained a judgment from the Court of First

Instance, Superior Court of San Juan, against AFU for the payment

of its portion of the commission AFU received on the 2008-09 and

2009-10 policies plus interest and costs. The judgment was

affirmed by the Court of Appeals of Puerto Rico in June 2012.

However, Industrial Re's attempts to collect against AFU were

unsuccessful because its principals passed away and the company

became insolvent.

 In April 2014, defendants' counsel sent a letter to plaintiffs

 8 A-2366-15T1
claiming Berkley owed Industrial Re sixty percent of the commission

it paid to AFU on the 2008-09 and 2009-10 policies, plus interest,

legal fees, and costs. In response, plaintiffs filed the instant

declaratory judgment action, asking for a declaration they are not

obligated to defendants for the 2008-09 and 2009-10 policy

commissions. In their answer, defendants asserted promissory

estoppel, unjust enrichment, and tortious interference

counterclaims.

 Plaintiffs filed a motion for summary judgment and defendants

cross-moved for summary judgment. After hearing oral argument,

the trial judge entered two orders: (1) an order granting summary

judgment in favor of plaintiffs, declaring that plaintiffs did not

owe defendants any commission on the 2008-09 and 2009-10 policies,

and dismissing defendants' counterclaims; and (2) an order denying

defendants' cross-motion for summary judgment. The trial judge

set forth her reasons in an oral decision.

 The trial judge first determined New Jersey law applied to

this dispute because "the performance at issue here is

[plaintiff's] payment of the commission to the defendants" and

"the principal place of business for both defendants and one

plaintiff is New Jersey." Applying the New Jersey six-year statute

of limitations, the judge concluded defendants' claims were time-

barred. However, the judge determined that, even if the 2009-10

 9 A-2366-15T1
policy commission claim was timely, plaintiffs still had no

obligation to pay defendants a portion of the commission they

already paid AFU because plaintiffs were not a party to the

Settlement Agreement. The judge noted further, there was no

contract, either express or implied, whereby plaintiffs agreed to

pay defendants the 2009-10 policy commission.

 With respect to defendants' promissory estoppel counterclaim,

the trial judge found plaintiffs made no promise to defendants to

pay the commission in accordance with the Settlement Agreement

and, in fact, expressly told them they were not bound by its terms

in a March 2008 email. The judge also determined defendants'

unjust enrichment counterclaim failed because plaintiffs paid the

commission in full to AFU.1 Finally, the judge determined

defendants' tortious interference counterclaim failed because they

provided no evidence that plaintiffs interfered with AFU's

performance of the Settlement Agreement.

 In their appeal, defendants argue the trial judge erred in:

concluding New Jersey's statute of limitations applied to their

claims (Point I), dismissing their claim based on promissory

estoppel (Point II), determining their claim for the 2009-10

commission accrued on September 19, 2008 (Point III), and

1
 Defendants do not challenge the court's decision on its unjust
enrichment counterclaim on appeal.

 10 A-2366-15T1
dismissing their counterclaim for tortious interference (Point

IV).

 We are unpersuaded by any of these arguments and affirm.

 II.

 The arguments raised in Points II and IV merit only the

following limited discussion.

 A.

 "Promissory estoppel is made up of four elements: (1) a clear

and definite promise; (2) made with the expectation that the

promisee will rely on it; (3) reasonable reliance; and (4) definite

and substantial detriment." Toll Bros., Inc. v. Bd. of Chosen

Freeholders of Burlington, 194 N.J. 223, 253 (2008) (citation

omitted).

 Defendants argue a prima facie showing of the elements of

promissory estoppel exist because plaintiffs made a clear and

definite promise to distribute the 2008-09 policy commission

directly to defendants on two occasions: (1) the March 5, 2008

email from Vosburgh stating, "As before, in the event of renewal(s)

[plaintiffs] will distribute the requisite proportionate share to

each of [AFU] and [defendants]," and (2) the August 12, 2008 email

from Vosburgh acknowledging the Settlement Agreement. Neither

document provides proof of "a clear and definite promise" by

plaintiffs to pay a commission to defendants.

 11 A-2366-15T1
 The very first sentence of the March 5, 2008 email clearly

states the purpose of the email was to "recap the positions of the

parties as [plaintiffs] understand them to be" and "provide

[defendants and AFU] the opportunity to correct any

misimpressions." Thus, the statements in the email – including

that plaintiffs "will distribute the requisite proportionate share

to" defendants – did not constitute a promise, but an articulation

of plaintiffs' understanding as to how the commission would be

distributed pursuant to the Settlement Agreement. More important,

the same email states:

 [I]t is once again pointed out that
 BRS/Admiral Insurance Company is not a party
 to the executed agreement between [AFU] and
 Industrial Re and cannot be bound by any of
 its terms.

 Defendants do not dispute that plaintiffs were not parties

to the Settlement Agreement and have produced no evidence that

plaintiffs agreed to be bound by the Settlement Agreement at any

time.

 Although plaintiffs acknowledged in an August 2008 email they

"were previously advised" to distribute the commission in

accordance with the Settlement Agreement, their willingness to do

so for the 2008-09 policy was explicitly dependent upon receiving

a written stipulation from both defendants and AFU to that effect.

Thus, plaintiffs were neither bound by the Settlement Agreement

 12 A-2366-15T1
nor any independent promise made to defendants.

 When viewed in the light most favorable to defendants, the

record contains insufficient evidence to permit a rational

factfinder to determine that plaintiffs made a "clear and definite

promise" to distribute defendants' portion of the 2008-09

commission directly to them. Summary judgment was therefore

properly granted, dismissing this claim.

 B.

 The elements of tortious interference with a contract are:

(1) the existence of a contract; (2) interference that was

intentional and done with malice; (3) the loss of the contract as

a result of the interference; and (4) damages. Printing Mart-

Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989). It

is undisputed that the Settlement Agreement between defendants and

AFU satisfied the first of these elements. The primary contention

on appeal concerns whether plaintiffs intentionally and

maliciously interfered with the defendant's rights under the

Settlement Agreement.

 Defendants argue the trial court failed to accord them all

favorable inferences from the evidence and contend a genuine issue

of fact regarding plaintiffs' interference with the Settlement

Agreement was presented by the following: Plaintiffs were aware

the Settlement Agreement provided that defendants would receive

 13 A-2366-15T1
60% of the commissions for the 2008-09 and 2009-10 policies and

"promised" to distribute the commission pursuant to the terms of

the Settlement Agreement.2 Plaintiffs "intentionally and

dishonestly interfered with" the Settlement Agreement by sending

the April 28, 2008, email in which Vosburgh described his

impression of the consequences of the Settlement Agreement.

Vosburgh stated, based upon his understanding of the Settlement

Agreement: Industrial Re is the agent of AFU; if the policy is

renewed, "it would not be necessary to show Industrial Re on the

declarations page"; and "if renewed, Admiral Insurance would pay

[AFU] the entire amount of brokerage decided on." Defendants

contend this email constituted the requisite interference because

it was "AFU's basis for withholding its consent for [plaintiffs]

to pay [defendants] their commission directly."

 To prove their claim, defendants were required to show they

lost the benefits of the Settlement Agreement "as a [direct] result

of defendants' malicious interference." Baldasarre v. Butler, 132

N.J. 278, 293 (1993). Malicious interference requires proof "that

the harm was inflicted intentionally and without justification or

excuse." Printing Mart, supra, 116 N.J. at 751. To qualify as

malice, "conduct must be both 'injurious and transgressive of

2
 As we have noted, the record fails to support defendants'
contention that plaintiffs made such a promise.

 14 A-2366-15T1
generally accepted standards of common morality or of law.'"

Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306-07 (2001)

(quoting Harper-Lawrence, Inc. v. United Merchants and Mfrs.,

Inc., 261 N.J. Super. 554, 568 (App. Div.), certif. denied, 134

N.J. 478 (1993)); see also Nostrame v. Santiago, 213 N.J. 109,

121-22 (2013)("[L]iability rests upon whether the interfering act

is intentional and improper.").

 Most clearly, "conduct that is fraudulent, dishonest, or

illegal" amounts to tortious interference. Lamorte Burns, supra,

167 N.J. at 307. On the other hand, "a party may not be held

liable for . . . merely providing truthful information to one of

the contracting parties." E. Penn Sanitation, Inc. v. Grinnell

Haulers, Inc., 294 N.J. Super. 158, 180 (App. Div. 1996), certif.

denied, 148 N.J. 458 (1997).

 In the email relied upon by defendants, Vosburgh explained

the procedure plaintiffs would follow based upon his understanding

of the Settlement Agreement and pursuant to "the traditional

[excess and surplus] market protocol that the [excess and surplus]

insurer must honor the source providing the 'first complete

submission.'" Rather than undermine the contract between AFU and

defendants, Vosburgh explicitly recognized AFU's obligation under

the Settlement Agreement to pay defendants their portion of the

commission.

 15 A-2366-15T1
 Vosburgh echoed this justification for plaintiffs' actions

in his September 19, 2008 email in which he advised Gutierrez the

full commission would be paid to AFU and stated:

 At no time was Berkley Risk Solutions/Admiral
 Insurance Company involved in any aspect of
 the development, negotiation or drafting of
 the "commission sharing" agreement between
 Industrial Re and [AFU]. Further Berkley Risk
 Solutions/Admiral Insurance Company is not a
 party to the agreement between Industrial Re
 and [AFU]. Accordingly, we believe it is
 appropriate for you to address future requests
 for a portion of the commission to [AFU]
 directly.

 Defendants have presented no evidence that Vosburgh's stated

reasons for remitting the entire commission to AFU were untrue or

dishonest. There is no evidence in the record that plaintiffs had

an improper motive in making commission payments directly to AFU

or that their interests were in any way advanced by distributing

the full commission to AFU. Notably, the amount of commission

they paid was the same regardless of how it was distributed.

 When viewed in the light most favorable to defendants, the

record contains insufficient evidence to permit a rational

factfinder to determine that plaintiffs intentionally and

maliciously interfered with the Settlement Agreement. As a result,

the court correctly dismissed defendants' tortious interference

claim on this ground.

 16 A-2366-15T1
 III.

 This court reviews "summary judgment orders de novo,

utilizing the same standards applied by the trial courts." Arroyo

v. Durling Realty, LLC, 433 N.J. Super. 238, 242 (App. Div. 2013).

 Under Rule 4:46-2(c), summary judgment is appropriate when

"the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact challenged

and that the moving party is entitled to a judgment or order as a

matter of law." The standard is "whether the competent evidential

materials presented, when viewed in the light most favorable to

the non-moving party in consideration of the applicable

evidentiary standard, are sufficient to permit a rational

factfinder to resolve the alleged disputed issue in favor of the

non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142

N.J. 520, 523 (1995). Nonetheless, if "the evidence is 'so one-

sided that one party must prevail as a matter of law' . . . the

trial court should not hesitate to grant summary judgment." Id.

at 536, 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202, 214 (1986)).

 IV.

 Defendants first challenge the trial judge's decision that

New Jersey law, and its six-year statute of limitations for

 17 A-2366-15T1
contract actions, N.J.S.A. 2A:14-1, applied to this action as

opposed to Puerto Rico law, which provides for a fifteen-year

statute of limitations for equivalent action, 31 L.P.R.A. § 5294.

As defendants acknowledge, New Jersey's choice of law principles

apply to this determination. See Rowe v. Hoffman-La Roche, Inc.,

189 N.J. 615, 621 (2007).

 Defendants contend that under the "most significant

relationship" test of the Restatement (Second) of Conflicts of

Laws (1971), Puerto Rico had "the paramount interest in applying

its law to the dispute." This test comports with the test applied

in New Jersey at the time this matter was argued in the trial

court, "a flexible 'governmental-interest' standard, which

requires application of the law of the state with the greatest

interest in resolving the particular issue that is raised in the

underlying litigation." Gantes v. Kason Corp., 145 N.J. 478, 484

(1996). We agree with the trial court's determination that, under

this test, New Jersey's statute of limitations applies. However,

that test is no longer applicable.

 In McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 574

(2017), the Supreme Court held "that section 142 of the Second

Restatement is now the operative choice-of-law rule for resolving

statute-of-limitations conflicts." The Court observed, "[t]he

adoption of section 142 is also a natural progression in our

 18 A-2366-15T1
conversion from the governmental-interest test to the Second

Restatement begun in P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J.

132 (2008), which adopted sections 146, 145, and 6 for resolving

conflicts of substantive tort law." Id. at 574-75. As we stated

in Fairfax Financial Holdings Ltd. v. S.A.C. Capital Management,

L.L.C., 450 N.J. Super. 1, 17 (App. Div. 2017), "any past

uncertainty about" the test applicable to a statute of limitations

conflict between two jurisdictions "evaporated with the

illumination provided" in McCarrell, and accordingly, we apply

that test here.

 "[U]nless exceptional circumstances make such a result

unreasonable," Restatement (Second), supra, § 142 provides that

"[t]he forum will apply its own statute of limitations barring the

claim."3 Stated succinctly, the Restatement (Second) § 142

standard is as follows:

 New Jersey, as the forum state, presumptively
 applies its own statute of limitations unless
 (1) New Jersey has no significant interest in

3
 Under Restatement (Second), supra, § 142, the forum will also
apply its own statute of limitation to permit the claim unless:

 (a) maintenance of the claim would serve no
 substantial interest of the forum; and
 (b) the claim would be barred under the
 statute of limitations of a state having a
 more significant relationship to the parties
 and the occurrence.

 19 A-2366-15T1
 the maintenance of the claim and [the other
 state], has "a more significant relationship
 to the parties and the occurrence"; or (2)
 given "the exceptional circumstances of the
 case," following the Second Restatement rule
 would lead to an unreasonable result. In
 light of section 142, if New Jersey has a
 substantial interest in the litigation, the
 inquiry ends, and New Jersey applies its
 statute of limitations, provided there are no
 "exceptional circumstances" making that
 "result unreasonable."

 [McCarrell, supra, 227 N.J. at 597 (citations
 omitted).]

 Here, Industrial Re and Admiral both have their principal

places of business in New Jersey, and Gutierrez, president of

Industrial Re, is domiciled in New Jersey. Although the underlying

dispute – defendants' entitlement to commissions paid on an

insurance policy placed in Puerto Rico pursuant to an agreement

with a Puerto Rican insurance agent – concerns Puerto Rico, this

present dispute concerns only the business dealings between, on

one side, a New Jersey-based reinsurance intermediary and its New

Jersey-domiciled president, and, on the other side, a New Jersey-

based insurance carrier and its Connecticut-based intermediary.

Because New Jersey has a substantial interest in resolving disputes

arising out of business dealings between two of its own

corporations, it is unnecessary to consider whether Puerto Rico

has a more significant relationship to the parties and the

contractual dispute. Furthermore, there is no indication that any

 20 A-2366-15T1
"exceptional circumstances" are present that would justify the

application of Puerto Rico law in New Jersey.

 V.

 Defendants filed their breach of contract claim pertaining

to the commissions for the 2009-10 policy on March 23, 2015. The

trial judge determined the accrual date for this breach of contract

claim was September 19, 2008, which would result in that claim

being time-barred.

 September 19, 2008 was the date Vosburgh informed defendants,

"Berkley/Admiral will remit the 100% of the commission due on [the

2008-09 policy] directly to [AFU]." The court reasoned that, on

that date, "defendants were on notice what the position of the

plaintiffs was with regard to payment of the commission" because

"[t]hey didn't pay one and it was very clear that they weren't

going to be dividing up the next one either without some"

authorization from AFU to do so.

 Defendants argue the trial judge erred in treating their

claim as one that would arise under an installment contract. They

contend the 2009-10 policy period did not renew until June 30,

2009 with the commission payable thirty days thereafter. As a

result, they assert their cause of action did not accrue until

July 31, 2009, when they claim they first had an enforceable right

to the commission. Plaintiffs counter the trial judge correctly

 21 A-2366-15T1
determined the September 19, 2008 email constituted a repudiation,

triggering the accrual of the cause of action.

 "For purposes of determining when a cause of action accrues

so that the applicable period of limitation commences to run, the

relevant question is when did the party seeking to bring the action

have an enforceable right." Metromedia Co. v. Hartz Mt. Assocs.,

139 N.J. 532, 535 (1995) (quoting Andreaggi v. Relis, 171 N.J.

Super. 203, 235-36 (Ch. Div. 1979)). In other words, a cause of

action accrues on "the date upon which the right to institute and

maintain a suit first arises." Holmin v. TRW, Inc., 330 N.J.

Super. 30, 35 (App. Div. 2000) (quoting Hartford Accident & Indem.

Co. v. Baker, 208 N.J. Super. 131, 135-36 (Law Div. 1985)), aff'd,

166 N.J. 205 (2001). A breach of contract claim "accrues at the

moment when the breach occurs." Hoppaugh v. McGrath, 53 N.J.L.

81, 85 (1890); see also Sodora v. Sodora, 338 N.J. Super. 308, 313

(Ch. Div. 2000).

 The trial judge's rationale comports with the doctrine of

anticipated breach, which "entitles a nonrepudiating party to

claim damages for total breach when the other party, through an

unambiguous affirmative act or statement, repudiates its

contractual duties prior to the agreed-upon time for performance."

Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super.

158, 178 (App. Div.), cert. denied, 196 N.J. 85 (2008).

 22 A-2366-15T1
 The cause of action could not have accrued until the 2009-10

policy commission became due, and AFU failed to pay defendants the

sixty-percent they claim was due to them. The policy's stated

contract period was "6/20/2009 to 6/30/2010." In a March 5, 2008

email plaintiffs "reserve[d] the right to decline the business

prior to the renewal date for [their] own reasons." AFU therefore

had no duty to pay defendants any commission on the 2009-10 policy

until the 2009-10 policy was renewed on June 30, 2009. The record

is unclear as to when a commission, if owed, was due.4

 However, the trial judge also cited an independent basis for

the dismissal of this claim. The judge determined that, even if

the 2009-10 policy commission claim were timely, plaintiffs still

had no obligation to pay defendants the portion of that policy's

commission because there was no contract, either express or

implied, whereby plaintiffs agreed to pay defendants the 2009-10

policy commission. Defendants do not challenge this particular

determination on appeal. As we have discussed, defendant's

promissory estoppel and tortious interference claims were properly

dismissed pursuant to Rule 4:46-2(c). In the absence of any

contractual obligation, this claim fails as well. Therefore, we

4
 Defendants assert, without citation to the record, that it
became payable on July 31, 2009, thirty days after the June 30,
2009 renewal date.

 23 A-2366-15T1
discern no reason to disturb the order granting summary judgment.

 Affirmed.

 24 A-2366-15T1